

FILED
*November 23, 2015*
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-15-00365-CV
7944990
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/23/2015 11:07:35 AM
JEFFREY D. KYLE
CLERK

No. 03-15-00365-CV

IN THE

THIRD JUDICIAL DISTRICT COURT OF APPEALS

at AUSTIN, TEXAS

---

JAMES C. MOSSER and MOSSER LAW PLLC,
Appellants

v.

BOB MIMS,
Appellee

---

APPEALED FROM THE 340th JUDICIAL DISTRICT COURT
TOM GREEN COUNTY, TEXAS

---

APPELLANTS' OPENING BRIEF

---

*MOSSER LAW PLLC*
James C. Mosser
Texas Bar No. 00789784
Nicholas D. Mosser
Texas Bar No. 24075405
Paul J. Downey
Texas Bar No. 24080659
2805 Dallas Parkway, Suite 220
Plano, Texas 75093
Tel. (972) 733-3223
Fax. (469) 626-1073
courtdocuments@mosserlaw.com
**LAWYERS FOR APPELLANTS, JAMES C. MOSSER AND MOSSER LAW, PLLC**

**APPELLANT REQUESTS ORAL ARGUMENT**

**IDENTITY OF PARTIES AND COUNSEL**

The following is a complete list of the parties, the attorneys, and any other person who has an interest in the outcome of this appeal.

**Appellants**
James C. Mosser
*MOSSER LAW, PLLC*, represented by
James C. Mosser
Texas Bar No. 00789784
Nicholas D. Mosser
Texas Bar No. 24075405
Paul J. Downey
Texas Bar No. 24080659
2805 Dallas Parkway, Suite 220
Plano, Texas 75093
Tel. (972) 733-3223
Fax. (469) 626-1073
courtdocuments@mosserlaw.com

**Appellee**
Bob Mims, represented by
Hay, Wittenburg, Davis, Caldwell & Bale, LLP
Larry W. Bale
Texas Bar No. 01629830
P.O. Box 271
San Angelo, Texas 76092
Tel. (325) 658-2728
lwb@hwdcb.com

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**. . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF CONTENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**INDEX OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**RECORD CITATION KEY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

**STATEMENT REGARDING ORAL ARGUMENT**. . . . . . . . . . . . . . . . . xii

**ISSUES PRESENTED**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**SUMMARY OF THE ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . 12

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *Standard of Review*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    **THE TRIAL COURT ERRED IN IMPOSING SANCTIONS AGAINST MOSSER
        LAW PLLC**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    **THE TRIAL COURT ERRED IN SANCTIONING JAMES C. MOSSER FOR THE
        FILING OF THE SECOND AND THIRD AMENDED PETITIONS**. . . . . . . 17

    **THE TRIAL COURT ERRED IN FINDING THAT THE PLEADINGS AND CLAIMS
        FILED IN THIS CASE WERE GROUNDLESS**. . . . . . . . . . . . . . . . 19

        **MELTON'S CONSTITUTIONAL CLAIM WAS NOT GROUNDLESS AND
            HAD EVIDENTIARY SUPPORT**. . . . . . . . . . . . . . . . . . . . . 21

        **MELTON'S FRAUD IN A REAL ESTATE TRANSACTION CLAIM WAS
            NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**. . . 29

**MELTON'S COMMON LAW FRAUD CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**. . . . . . . . . . . . . . . . . . . [39](#)

**MELTON'S DECEPTIVE TRADE PRACTICES ACT CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**. . . . . . . [43](#)

**MELTON'S BREACH OF CONTRACT CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**. . . . . . . . . . . . . . . . . . . [46](#)

**MELTON'S NEGLIGENCE CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**. . . . . . . . . . . . . . . . . . . . . . . . . [49](#)

**THE TRIAL COURT ABUSED ITS DISCRETION IN SANCTIONING MOSSER FOR BRINGING ALLEGEDLY TIME-BARRED CLAIMS AGAINST APPELLEE**. . . . . . . . . . . . . . . . . . . . . . . . . [52](#)

**THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE PLEADINGS WERE BROUGHT FOR AN IMPROPER PURPOSE**. . . . . [61](#)

**PRAYER**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [68](#)

**CERTIFICATE OF COMPLIANCE**. . . . . . . . . . . . . . . . . . . . . . . . . . [70](#)

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . [70](#)

**APPENDIX TO APPELLANT'S BRIEF**. . . . . . . . . . . . . . . . . . . . . . . [71](#)

# INDEX OF AUTHORITIES

## CASES

*American Flood Research, Inc. v. Jones,* 192 S.W.3d 581 (Tex. 2006). . 14

*Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex. 1996).. . . . . . . 43

*Bennett v. Grant,* 460 S.W.3d 220 (Tex.App.–Austin 2015, pet. filed). . 14, 29, 39, 52, 61, 67

*Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 610 (Tex.App–Waco 2000, pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*City of Fort Worth v. Pippen,* 439 S.W.2d 660 (Tex. 1969). . . . . . . . . 28, 52

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005). . . . . . . 15, 41, 60, 67

*Dike v. Peltier Chevrolet, Inc.,* 343 S.W.3d 179 (Tex.App.–Texarkana 2011, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64, 66

*Dolenz v. Boundy,* 197 S.W.3d 416 (Tex.App.–Dallas 2006, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.,* 252 S.W.3d 586 (Tex.App.–Fort Worth 2008, pet. denied). . . . . . . . . . . . . . . . . . . . 50, 51

*Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573 (Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 40, 42

*Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41 (Tex. 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 58

*Greenway Bank & Trust v. Smith,* 679 S.W.2d 592 (Tex.App.–Houston [1st Dist.] 1984, writ ref'd n.r.e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hannaway v. Deutsche Bank Nat'l Trust Co.,* A-10-CV-714-LY, 2011 WL 891669 at *5 (W.D. Tex, Mar. 11, 2011). . . . . . . . . . . . . . . . . . . . . . 57

*Hansberger v. EMC Mortg. Corp.,* Docket No. 04-08-00438-CV, 2009 WL 2264996 at *4 (Tex.App.–San Antonio 2009, no pet.). . . . . . . . . . . . . . . . 30

*KPMG Peat Marwick v. Harrison County Housing Finance Corp.,* 988 S.W.2d 746 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 59

*Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d 244 (Tex.App–Austin 2007, no pet). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20, 61

*Latham v. Castillo,* 972 S.W.2d 66 (Tex. 1998).. . . . . . . . . . . . . . . . . . . . 45

*Low v. Henry,* 221 S.W.3d 609 (Tex. 2007). . . . . . . . . . . . . . . . . . . . 14, 20

*Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546 (Tex. 1985). . . . . . . . . . . 53

*Office of Pub. Util. Counsel v. Public Util. Com'n of Texas,* 878 S.W.2d 598, 600 (Tex. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*Retherford v. Castro,* 378 S.W.3d 29 (Tex.App.–Waco 2012, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169 (Tex. 1983). . . . . . . . . . . 44

*Robson v. Gilbreath,* 267 S.W.3d 401 (Tex.App.–Austin 2013, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 61

*S.V. v. R.V.* 933 S.W.2d 1 (Tex. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Schanzle v. JPMC Specialty Mortg. LLC,* No. 03-09-00639-CV, 2011 WL 832170 at *4 (Tex.App.–Austin Mar. 11, 2011, no pet.). . . . . . . . . . . . . . 56

*Sierra Blanca Indep. Sch. Dist. v. Sierra Blanca Corp.,* 514 S.W.2d 782 (Tex.Civ.App.–El Paso 1974, writ ref'd.). . . . . . . . . . . . . . . . . . . . 25, 27, 33

*Southwestern Bell Tel. Co. V. DeLanney,* 809 S.W.2d 493 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*State v. PR Investments and Specialty Retailers, Inc.,* 180 S.W.3d 654

(Tex.App.–Houston [14th Dist.] 2005, pet. granted). . . . . . . . . . . . . . . . . . 61

*Tarrant County v. Chancey*, 942 S.W.2d 151 (Tex.App.–Fort Worth 1997, no writ.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Transport Insurance Company v. Faircloth,* 898 S.W.2d 269 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

*Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex. 1983). . . . . . . . . . . . . . . . . 34

*Walker v. Packer,* 827 S.W.2d 833 (Tex. 1992). . . . . . . . . . . . . . 27, 42, 52

*Yuen v. Gerson,* 342 S.W.3d 824 (Tex.App.–Houston [14th Dist.], pet. denied.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 39, 46, 50

## CONSTITUTIONAL PROVISIONS
TEX. CONST. ART. XVI § 50(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

TEX. CONST. ART. XVI § 50(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

## FEDERAL STATUTES
28 U.S.C. § 1332(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

## STATE STATUTES
TEX. BUS. & COM. CODE § 17.45. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. BUS. & COM. CODE § 17.49. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

TEX. BUS. & COM. CODE § 27.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TEX. BUS. & COM. CODE §17.565. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

TEX. CIV. PRAC. & REM. CODE § 10.001. . . . . . . . . . . . . . . . . . 20, 32, 62

TEX. TAX. CODE § 23.01(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33, 45

TEX. TAX. CODE § 23.01(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [24], [33]

## **RULES**

TEX. R. APP. 33.1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [15]

TEX. R. CIV. P 13.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [16], [21], [61]

TEX. R. CIV. P. 51(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [21]

TEX. R. EVID. 201(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [26]

TEX. R. EVID. 201(f).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [26]

## **OTHER AUTHORITIES**

Act of May 28, 1983, 68th Leg. R.S., ch. 949, 1983 Gen. Laws. 5208. . . . [31]

# RECORD CITATION KEY

Citations to the clerk's record will appear as CR Vol ___, ___. For example, [CR Vol 1:1] means "Clerk's Record, Volume 1, Page 1.

Citations to the reporter's record will appear as "RR Vol.___, ___:___. For example, RR Vol. 2, 1:1 means "Reporter's Record, Volume 2, page 1, line 1."

Citations to the Appendix in Support of Brief of Appellants will appear as App.___. For example, [App. 1] means Page One of the appendix. For clarity, each page in the Appendix in Support of Brief of Appellants has been labeled on the bottom right corner of the page.

## STATEMENT OF THE CASE

1.   This case arises from the closing of Ben Melton's home equity loan in violation of Section 50(a) et seq., of Article XVI of the Texas Constitution by lending an amount in excess of 80 percent of the fair market value of Melton's property. [CR Vol. 1, 7-11].

2.   Melton, by and through attorneys James C. Mosser and Alexis Steinberg, brought suit in Tom Green County, the situs of the property, to declare the lien on Melton's property void, to cancel the remaining debt secured by Melton's homestead, and to recover principal and interest paid by Melton. CU Member's Mortgage, First Western Title Co., and Bob Mims, who appraised Melton's property, were the named defendants in the case. [*Id.*].

3.   The trial court granted summary judgment in favor of all defendants as to all of Melton's claims. [CR Vol. 1, 358-60; 429-30]; [CR Vol. 2, 19].

4.   Additionally, the trial court awarded Bob Mims $15,366.55 in attorney's fees as sanctions under Rule 13 of the Texas Rules of Civil Procedure and Chapter 10 of the Texas Civil Practices and Remedies Code. [CR Vol. 1, 420-428].

5.      This appeal from the sanctions order follows.

## STATEMENT REGARDING ORAL ARGUMENT

The Court of Appeals should conduct oral argument because this appeal involves the resolution of complex questions of Texas Constitutional Law regarding detailed factual issues. Oral argument will help the Court's understanding of the factual relationship between the parties and the posture of the case, particularly because the trial court's ruling conflicts will the applicable law. It will also allow the Appellants to explain the logic undergirding each claim and petition filed in this case, and to show how diversity jurisdiction could not have been established by any party in this case. Finally, it will allow Appellants to demonstrate to the Court that there was no sanctionable conduct upon which the trial court could have based its order. The Appellants therefore respectfully urge the Court to allow oral argument in this case.

## ISSUES PRESENTED

1.  Whether the trial court erred in sanctioning Mosser Law PLLC, an entity that cannot be sanctioned.

2.  Whether the trial court erred in sanctioning James C. Mosser for filing the Second and Third Amended Petitions, when he did not sign either of those petitions.

3.  Whether the trial court erred in finding that the Petitions and Claims filed in this case were groundless and without evidentiary support

4.  Whether the trial court erred in finding that the petitions and claims filed against Appellee were filed to defeat diversity jurisdiction in a case with no diverse parties.

## STATEMENT OF FACTS

1. On March 13, 2009, Ben Melton executed a Home Equity Note with CU Members Mortgage for $223,648.00, a sum secured by his homestead located in Tom Green County, Texas. [CR Vol. 1, 63-68; 70-84]. As part of the same transaction on March 13, 2009, Ben Melton and CU Members Mortgage also executed a statement acknowledging that the fair market value of Melton's property on that date was $300,000.00. [CR Vol.1, 94]. This acknowledgment states, "The fair market value indicated herein is the value estimated in the appraisal which was prepared in accordance with state or federal requirements applicable to this extension of credit." [*Id.*] The box next to this statement is ticked, indicating that this statement applies to this acknowledgment. [*Id.*]

2. This appraisal was performed by the Appellee on January 30, 2009 and transmitted to CU Members Mortgage on February 3, 2009. [CR Vol. 1, 104-05; RR Vol. 3, 51].

3. On March 13, 2013, Counsel for Plaintiff, James C. Mosser, filed an Original Petition in Cause No. C130102C, *Melton v. CU Members Mortgage, et al.* [CR Vol 1, 7]. The suit named Appellee as a party.

[*Id.*]

4. As stated in his Original Petition, Ben Melton is an individual resident of Tom Green County, Texas. [*Id.* at ¶2].

5. Defendant CU Member's Mortgage, a division of Colonial Savings, FA, (hereinafter "Colonial") was also a resident of Texas, with its home office located at 2600 West Freeway, Fort Worth, Texas 76102. [*Id.* at ¶3; CR Vol. 1, 59 at ¶ 10].

6. Defendant First Western Title Company was also a Texas resident, with its home office located at 1500 Norwood Dr., Suite 400, Hurst, Texas 76054. [*Id.* at ¶5].

7. Finally, Appellee was also a Texas resident from San Angelo, Texas. [*Id.* at ¶4].

8. Plaintiff alleged that Defendant Colonial violated the Texas Constitution by closing a home equity loan sought by Melton for which the principal loan amount exceeded eighty percent of the fair market value of property that secured the loan. [CR Vol. 1, 8].

9. The Plaintiff specifically alleged that Appellee "aided [co-defendant] Colonial and Defendant Western Title in the execution of this violation by providing a false and fraudulent real estate appraisal."

[CR Vol.1, 8 at ¶11(b); 9 at ¶11(f)].

10. Based on these factual allegations, Plaintiff sought declaratory relief invalidating the unconstitutional loan, forfeiture of all principal and interest paid on the note up to the point of suit, and forfeiture of all remaining principal and interest on the note. [CR Vol. 1, 9 at ¶13]. Plaintiff also sought exemplary damages for fraud in a real estate transaction under TEX. BUS. & COM. CODE § 27.01. [CR Vol. 1, 10 at ¶21].

11. In his request for relief, Plaintiff specifically sought to recover "judgment from and against Defendants for the forfeiture of all principal and interest on the Loan, including but not limited to a judgment from and against Defendants for payment of all principal and interest paid by Plaintiffs to Defendant to date..." [CR Vol.1, 11 at ¶27].

12. Additionally, the plaintiff sought to recover "such other and further relief, both in law and equity to which Plaintiffs may show themselves to be justly entitled." [CR Vol 1, 11 at ¶31].

13. The signature block for the Original Petition bears the electronic signature of James C. Mosser. [CR Vol. 1, 11].

3

14. On May 31, 2013, Defendant Colonial, a Division of Colonial Savings F.A. and Defendant First Western Title Co., filed their original answer in this cause. [CR Vol. 1, 12-15]. On June 27, 2013, these defendants filed their first amended answer. [CR Vol. 1, 16-19].

15. On July 24, 2013, Appellee filed his Original Answer and Motion for Rule 13 Sanctions seeking sanctions "under Rule 13 against Ben Melton and his attorney of record" for the filing of Plaintiff's Original Petition. [CR Vol. 1, 20-22].

16. On August 05, 2013, Plaintiff Ben Melton filed his First Amended Petition in this case, reasserting his claims under the Texas Constitution, its Declaratory Judgment Action, its Fraud in a Real Estate Transaction claim, and adding a claim against Appellee under the Deceptive Trade Practices Act. [CR Vol. 1, 23-27]. Again, Melton stated twice, "Defendant Mims aided Colonial and Defendant Western Title in the execution of this violation by providing a false and fraudulent residential real estate appraisal." [CR Vol.1, 24 at ¶ 6(b), (f)].

17. James C. Mosser was the signing attorney on the Plaintiff's First Amended Petition. [CR Vol. 1, 27].

18. On September 17, 2013, Plaintiff Melton filed his Second Amended Petition, reasserting its previous claims and more fully explicating Appellee's role in the loan transaction. [CR Vol. 1, 34-40]. Specifically, Plaintiff alleged that on review of the appraisal performed in this case, Appellee failed to follow the Uniform Standards of Professional Appraisal Practice by failing to consider the effect of the terms and conditions of a lease on leasehold property, and failed to refrain from valuing the property solely by adding together the individual values of the various estates. [CR Vol. 1, 35-36 at ¶ 6(d),(e)].

19. Plaintiff Melton then alleged that Defendant Colonial violated the Texas Constitution when it closed his home equity loan without providing the true fair market value of Mr. Melton's home on the date the loan closed, and that Appellee "aided in the execution of the violation by providing a false and fraudulent residential real estate appraisal. [CR Vol. 1, 36 at ¶ 6(i)].

20. Alexis F. Steinberg signed Plaintiff's Second Amended Petition. [CR Vol. 1, 39].

21. On September 28, 2013, Defendants Colonial and First Western Title

Co. moved for Summary Judgment in this case. In support of their motion, Defendants submitted Exhibit A-9, a copy of the settlement statement generated in connection with the loan, which detailed the transaction costs. [CR Vol. 1, 100-102]. In the section entitled "Settlement Charges," Line 103 bears the notation POC (B) in reference to the cost of the appraisal, which was paid to "CU Members Mortgage for Mims, Bob." [CR Vol. 1, 101]. P.O.C. means paid outside of closing. [CR Vol. 1, 100]. An affidavit proving up these records under the business records exception to the hearsay rule accompanied these documents. [CR Vol. 1, 56-61]. Plaintiff raised no objection to the entry of these documents into evidence. [CR Vol. 1, 216-56].

22. Shortly thereafter, Appellee filed his First Motion for Summary Judgment. [CR Vol. 1, 169-215].

23. On December 16, 2013, Plaintiff Melton filed his third Amended Petition in this suit, in which he pleaded the discovery rule, reasserted his Texas Constitutional Claim, his request for Declaratory Relief, his request for damages under the Deceptive Trade Practices Act, and added claims for common law fraud, breach

6

of contract, and negligence against all defendants. [CR Vol. 1, 257-266]. Melton did not include his claim for fraud in a real estate transaction in this pleading. *Id.*

24. Alexis Steinberg was the signing attorney on Melton's Third Amended Petition, Plaintiff's final pleading in this case. [CR Vol. 1, 265].

25. On December 16, 2013, and January 3, 2014, Melton filed his responses to both defendants' Motions for Summary Judgment. [CR Vol. 1, 216-256; 267-298]. Melton's attorneys stated, "Melton has amended his petition to remove the claims for statutory fraud, as Melton has researched Defendant's arguments and determined that the statutory fraud claims is unsupportable." [CR Vol. 1, 216.] In support of denying Appellee's Motion for Summary Judgment, Melton submitted the Settlement Statement included by Defendant Colonial in support of its Motion for Summary Judgment. [CR Vol. 1, 286-292].

26. Colonial substantively responded to the discovery rule as plead. CR Vol. 3, 9]. Appellee, for his part, merely adopted Colonial's Argument. [CR Vol. 2, 6-7].

27. On May 21, 2014, the trial court granted Appellee's First Motion for

Summary Judgment, having sustained Mims' Objections to Melton's Evidence in Support of its Response to Mims' Motion for Summary Judgment. [CR Vol. 2, 19-20].

28. On May 20, 2014, Appellee filed his Second Motion for Summary Judgment on Melton's remaining claims. [CR Vol. 1, 307-318]

29. The Court issued a letter ruling granting Appellee's Second Motion for Summary Judgment on July 10, 2014. [RR Vol. 3, 84]. The court did not sign the judgment until March 12, 2015. [CR Vol. 1, 429-430].

30. On December 29, 2014, Appellee filed his first Amended Motion for Sanctions, which for the first time included a claim for sanctions under Chapter 10 of the Texas Civil Practices and Remedies Code. [CR Vol. 1, 404-408]. Appellee attached no exhibits in support of the motion. [*Id.*]

31. The trial court held the hearing via Court Call on Appellee's First Motion for Sanctions on January 7, 2015. [RR Vol. 2, 1-113].

32. At the hearing, Counsel for Appellee introduced into evidence a document signed by Melton acknowledging $300,000.00 as fair market value of his property. [RR Vol. 2, 22:14, RR Vol. 3, 34]. The acknowledgment states, "The fair market value indicated herein is

8

the value estimated in the appraisal which was prepared in accordance with state or federal requirements applicable to the extension of credit." [RR Vol. 3, 34].

33. Appellee testified from his appraisal package, which was admitted, that the "Intended user of the report is CU Members Mortgage and/or its assigns." [RR Vol. 2, 48: 18-23; RR Vol. 3:62].

34. Counsel for Appellee also introduced the Tom Green County Appraisal District tax records for Mr. Melton's property which the County valued at $171,500.00. [RR Vol. 2, 34-36; RR Vol. 3, 37]. During cross-examination, Appellee testified that the Tax Appraisal District "had a different opinion of value than [he] did" and conceded that the Appraisal District had valued the property at $171,500.00. [RR Vol. 2, 67:4-14].

35. Appellee further testified that he was appraising the fair market value of the property. [RR Vol. 2, 40: 6-8].

36. Appellee also testified that he received $350.00 in compensation for the appraisal. [RR Vol. 2, 61: 25 - 62: 1-2]. On cross-examination, Appellee testified that the sum was "Cash on Delivery" and was to be paid at the door. [RR Vol. 2, 65:16-25].

37. Over the relevance objection of Mr. Mosser, the Court then admitted Appellee's Exhibit 9, documents filed in *Priester v. Long Beach Mortgage Company and JP Morgan Chase & Co., et al.*, 4:10-cv-00641. [RR Vol 2:84-85]. In response to Mr. Mosser's objection, Counsel for Appellee stated that the documents were relevant "because it shows a pattern this attorney has used in another case almost identical." [RR Vol. 2, 85: 15-17]. The trial court agreed, admitting the documents with the caveat that the court would "disregard any testimony about diversity jurisdiction, or that purpose." [*Id.:* 18-22]. The trial court would later find that the "primary purpose for naming Bob Mims as a defendant in this case was to defeat diversity jurisdiction and the removal of this cause to federal court." [CR Vol. 1, 425].

38. During closing argument, Mr. Mosser requested that the court take judicial notice of Texas Tax Code section 23.01, which requires that all taxable property is appraised at its market value as of January 1 each year. [RR Vol. 2, 107:6-13, 25; 108:1-5]. Counsel for Appellee objected on grounds that this fact had not been admitted into evidence, a sentiment the court appeared to agree with when it

directed Mr. Mosser to "stay away from things that have not been admitted." [RR 2, 107: 14-16, 19-24].

39.    The trial court granted Mims' First Amended Motion for Sanctions on March 12, 2015. [CR Vol 1, 420-428].

40.    James Mosser and Mosser Law PLLC filed their Motion for New Trial on April 13, 2015 and their Notice of Appeal on June 10, 2015. [CR Vol. 1, 435-442; 495-497].

## SUMMARY OF THE ARGUMENT

At its heart, this case represents an abuse of the trial court's authority to sanction a party with whom it disagrees under the Texas Rules of Civil Procedure and the Texas Civil Practices and Remedies Code. Sanctions are tools "that must be available to trial courts in those egregious situations where the worst of the bar uses our honored system for ill motive without regard to reason and the guiding principals of the law." *Tarrant County v. Chancey*, 942 S.W.2d 151, 154-55 (Tex.App.–Fort Worth 1997, no writ.). This case was not worthy of the court's power to punish such offenders.

Though both the appellee and the trial court claimed and stated that the purpose of making the appellee appear in court was to defeat Federal Diversity Jurisdiction, nothing could be further from the truth. [CR Vol. 1, 425, ¶ 37]. By filing on behalf of Ben Melton, James C. Mosser put before the trial court a unique constitutional claim seeking the voiding of an extension of credit due to irregularities in the Appellee's appraisal, as well as other claims related to the preparation of the appraisal. *See* [CR Vol. 1:8 at ¶11(b), (f); 24 at ¶ 6(b), (f); 34-36 at ¶6(b)-(e), (i); 258 at ¶6(b)-(e), (l)]. Thus, the goal of the suit was not to defeat diversity jurisdiction but to

12

seek recovery from appellee for his role in the making of an unconstitutional extension of credit.

Thus, the court had no grounds under either Chapter 10 of the Texas Civil Practices and Remedies Code or Rule 13 of the Texas Rules of Civil Procedure for sanctioning James C. Mosser, or the law firm Mosser Law PLLC. Though the court ultimately disagreed with Mosser and awarded summary judgment against his client, the court was not free to punish Mosser for making claims on which he ultimately did not prevail. *See Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d 244, 254 (Tex.App–Austin 2007, no pet). Courts have stated of the statutory and rule-based power to sanction: "The rule, however, cannot become a weapon used to punish those with whose intellect or philosophic viewpoint the trial court finds fault." *Chancey*, 942 S.W.2d at 155 (*citing Dyson Descendant Corp. v. Sonat Exploration Co.,* 861 S.W.2d 942, 951 (Tex.App.–Houston [1st Dist.] 1993, no writ.). This court should not allow the trial court to use these authorities as weapons, and should reverse the award of sanctions against James C. Mosser and Mosser Law PLLC.

**ARGUMENT**

*Standard of Review*

41. The Court reviews the trial court's imposition of sanctions under Texas Rule of Civil Procedure 13 and Texas Civil Practices and Remedies Code Chapter 10 for an abuse of discretion. *Low v. Henry,* 221 S.W.3d 609, 614 (Tex. 2007). In reviewing the sanctions order, the court reviews the entire record to determine whether the trial court abused its discretion. *American Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex. 2006).

42. An appellate court may reverse the trial court's ruling only if the trial court acted without any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Low,* 221 S.W.3d at 614. At the very least this requires a showing that the trial court based its order on an incorrect interpretation of the law or a clearly erroneous assessment of the evidence. *Bennett v. Grant,* 460 S.W.3d 220, 255 (Tex.App.–Austin 2015, pet. filed)(citing *Robson v. Gilbreath,* 267 S.W.3d 401, 405 (Tex.App.–Austin 2008, pet. denied)). Because the trial court is without discretion to decide what the law is or how to apply it, appellate courts review legal issues de novo. *Interstate*

14

*Northborough Prtshp. v. State,* 66 S.W.3d 213, 220 (Tex. 2001); *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992).

43. The court will sustain a legal sufficiency challenge if the evidence shows a complete absence of a vital fact; rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; the evidence offered to prove a vital fact is no more than a mere scintilla; or the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

44. In a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence may be made for the first time on appeal in the complaining party's brief. TEX. R. APP. 33.1(d); *see also Yuen v. Gerson,* 342 S.W.3d 824, 827 at n.3 (Tex.App.–Houston [14th Dist.], pet. denied.).

### THE TRIAL COURT ERRED IN IMPOSING SANCTIONS AGAINST MOSSER LAW PLLC

45. The trial court erred in sanctioning Mosser Law PLLC under Texas Rule of Civil Procedure 13 or Texas Civil Practice and Remedies Code Section 10.004, as the evidence conclusively establishes that Mosser Law PLLC did not sign any of underlying pleadings in this

case, and the law conclusively establishes that Mosser Law PLLC lacked capacity to sign those pleadings.

46. Sanctions under Rule 13 are appropriate against the person who signed the pleading, a represented party or both. TEX. R. CIV. P 13.

47. Likewise, the Civil Practices and Remedies Code restricts pleadings-based sanctions to the person who signed the pleading, a party represented by the person, or both. TEX. CIV. PRAC & REM CODE § 10.004(a).

48. Three courts of appeals have held that the express language of Rule 13 limits sanctions for groundless pleadings to the *attorney who actually signed the pleadings,* the party represented by that attorney, or both. *Yuen v. Gerson,* 342 S.W.3d at 828 (*citing In re Hill,* No. 2-07-295-CV, 2007 WL 2891059, at *2 (Tex.App.–Fort Worth Oct. 3, 2007, orig. proceeding (mem. op.); *Metzger v. Sebek,* 892 S.W.2d 20, 52 (Tex.App.–Houston [1st Dist.] 1994, writ denied)(emphasis added).

49. The record evidence establishes that James C. Mosser signed the Original Petition and the First Amended Petition. [CR Vol. 1, 11; 27].

50. The evidence also establishes that Alexis Steinberg signed the

Second and Third Amended Petitions. [CR Vol. 1, 39;  265].

51.   The evidence further establishes that the parties to the suit were Ben Melton; Colonial, a Division of Colonial; First American Title; and Bob Mims. [CR Vol. 1, 7].

52.   Thus, the record conclusively establishes that Mosser Law PLLC was neither a party nor a signatory to any of the pleadings filed in this case, such that the trial court abused its discretion in sanctioning Mosser Law PLLC. [CR Vol. 1, 11; 27; 39; 265].

53.   Additionally, whether Mosser or Steinberg signed on behalf of the firm is irrelevant. Entities, such as law firms, may not be licensed to practice law and therefore cannot sign pleadings as only individuals duly licensed to practice law may sign a pleading. *Yuen v. Gerson,* 342 S.W.3d at 828-29 (*citing* TEX. GOVT. CODE §§ 1.051(a); 81.101(a)).

54.   Thus, the evidence is legally insufficient to support the trial court's order of sanctions against Mosser Law PLLC such that the judgment against Mosser Law PLLC should be reversed.

**THE TRIAL COURT ERRED IN SANCTIONING JAMES C. MOSSER FOR THE FILING OF THE SECOND AND THIRD AMENDED PETITIONS**

55.   The trial court further abused its discretion in sanctioning James C.

17

Mosser under Rule 13 and Chapter 10 with respect to the Second and Third Amended Petitions as he was not the signatory attorney to either of those petitions.

56. Under the analysis previously stated, *supra at* ¶ 45-54, Rule 13 and Chapter 10 provide for sanctions against the attorney who actually signed the pleadings and a represented party. *Yuen v. Gerson,* 342 S.W.3d at 828 (*citing In re Hill,* No. 2-07-295-CV, 2007 WL 2891059, at *2 (Tex.App.–Fort Worth Oct. 3, 2007, orig. proceeding (mem. op.); *Metzger v. Sebek,* 892 S.W.2d 20, 52 (Tex.App.–Houston [1st Dist.] 1994, writ denied)(emphasis added)

57. The record evidence establishes that James C. Mosser signed the Original Petition and the First Amended Petition but did not sign the Second and Third Amended Petitions. [CR Vol. 1:11; 27].

58. The evidence establishes that Alexis Steinberg signed the Second and Third Amended Petitions. [CR Vol. 1, 39; 265].

59. Thus, the evidence is legally insufficient to support an award of sanctions against James C. Mosser for the filing of the Second and Third Amended Petitions in this case, such that the trial court's award of sanctions against James C. Mosser should be reversed.

## THE TRIAL COURT ERRED IN FINDING THAT THE PLEADINGS AND CLAIMS FILED IN THIS CASE WERE GROUNDLESS

60. The Trial Court erred in sanctioning James C. Mosser under Texas Rule of Civil Procedure 13 as neither the evidence nor the law supports the proposition that the pleadings filed in this case were groundless. Furthermore, all claims in this case had some evidentiary support and were warranted by existing law or nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, such that sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code were improper. Sanctions may only be imposed under Texas Rule of Civil Procedure 13 against an attorney, a represented party, or both who file a pleading that is either groundless and brought in bad faith; or groundless and brought for the purpose of harassment. *Robson v. Gilbreath,* 267 S.W.3d 401, 405 (Tex.App.–Austin 2013, pet. denied)(*citing* TEX. R. CIV. P. 13). "Groundless" means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. TEX. R. CIV. P. 13.

61. Additionally, courts may impose sanctions under Chapter 10 of the

19

Texas Civil Practices and Remedies Code for filing pleadings with an improper purpose, even if the suit was not frivolous. *Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d 244, 257 (Tex.App–Austin 2007, no pet); *See also Low v. Henry,* 221 S.W.3d 609, 614 (Tex. 2007)("Chapters 9 and 10 of the Texas Civil Practices and Remedies Code and rule 13 of the Texas Rules of Civil Procedure allow a trial court to sanction an attorney or party for filing motions or pleadings that lack a reasonable basis in fact or law.").

62. In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Robson,* 267 S.W.3d at 409. Courts presume that pleadings, motions, and other papers are filed in good faith, and the party moving for sanctions has the burden of overcoming this presumption. *Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d 244, 256 (Tex.App–Austin 2007, no pet).

63. Because a party may join as many claims legal or equitable or both as he may have against an opposing party in a single petition, evaluating each claim in this case under Chapter 10 also constitutes an evaluation of the pleadings under Rule 13. *See* TEX. CIV. PRAC.

& REM. CODE § 10.001; TEX. R. CIV. P. 13; TEX. R. CIV. P. 51(a).

**MELTON'S CONSTITUTIONAL CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**

64. The undisputed facts establish that Ben Melton contracted with Colonial for a $223,648.00 extension of credit secured by his homestead. [CR Vol.1, 100]. Ultimately, each claim against Appellee in this case arose out of this loan transaction between Melton and Colonial, which Melton alleged was made in violation of Article 16 Section 50 of the Texas Constitution. [CR Vol. 1, 8; 24; 34-36; 257-266].

65. The Texas Constitution authorizes an extension of credit secured by a homestead under a very strict set of conditions designed by the drafters to make homestead alienation extremely difficult. TEX. CONST. ART. XVI § 50(a)(6). The most critical of these conditions is the requirement that any line of credit extended by a lender may not exceed eighty percent of the fair market value of the homestead. TEX. CONST. ART. XVI § 50(a)(6)(B). In furtherance of this requirement, the Constitution requires that both the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead on *the date the extension of*

21

*credit is made.* TEX. CONST. ART. XVI § 50(a)(6)(Q)(ix)(emphasis added).

66. This acknowledgment is not absolute as to the homeowner. Lenders may only conclusively rely on the acknowledgment to act as a bar to recovery if an appraisal has been performed according to state or federal standards, and the lender does not have actual knowledge that the fair market value stated in the acknowledgment was incorrect. TEX. CONST. ART. XVI § 50(h). If an appraisal is not performed according to federal or state appraisal standards, or the lender has actual knowledge that the fair market value of the property stated in the written acknowledgment is incorrect, then the entire principle amount of the loan and the lender's right to the interest collected is at risk. *Compare id. with* TEX. CONST. ART. XVI § 50(a)(6)(Q)(x).

67. The appraisal thus is the linchpin of the entire loan transaction, and the appraiser an indispensable party to litigation that seeks to establish that a lender assisted by an appraisal that fails to comply with state and federal appraisal standards extended credit in excess of Texas Constitutional requirements. *See* TEX. CONST. ART. XVI §

50(h)(1). The appraiser's presence is of even greater importance when the allegation is that the lender received an appraisal it knew to be incorrect so as to mask its actual knowledge of the fair market value of the house, thereby allowing the lender to make an extension of credit secured by the homestead. *See* TEX. CONST. ART. XVI § 50(h)(2).

68. The undisputed facts known to James C. Mosser about the appraisal as of the date of filing of Melton's Original Petition establish that Appellee was aware of an appraisal performed by the Tom Green County Central Appraisal District on January 1, 2008 that valued Mr. Melton's property at $171,500.00. [RR Vol. 2, 67:9-11; RR Vol. 3:37]. Despite this appraisal, Appellee appraised Ben Melton's homestead for $300,000.00 on January 30, 2009, a increase in value of $128,500.00 in only one year. [CR Vol. 1, 104; RR Vol. 2, 49:9-11]. Appellee further testified at the sanctions hearing that this appraised value, $171,500.00, constituted the fair market value of the property. [RR Vol.2, 40: 6-8]. Because an appellate court can take judicial notice of a fact for the first time on appeal, James C. Mosser requests that this court take judicial notice of the 2009 appraisal

23

performed by the Tom Green County Tax Assessor, valuing the property at $189,500.00 as of January 1, 2009, a mere twenty-nine days prior to Appellee's appraisal of Melton's property. [App.38]; *Office of Pub. Util. Counsel v. Public Util. Com'n of Texas,* 878 S.W.2d 598, 600 (Tex. 1994).

69.   The Texas Tax Code requires that county tax assessors appraise all taxable property at its market value as of January 1. TEX. TAX. CODE § 23.01(a). Additionally, the County Tax Assessor is required by law to determine the market value of property by the application of mass appraisal standards that comply with the Uniform Standards of Professional Appraisal Practice. TEX. TAX. CODE § 23.01(b). These are the very same methods and techniques that Appellee Mims certified using in his appraisal of Melton's property. [RR Vol.3, 59 at ¶3] ("I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice...").

70.   The conflict between the Tom Green County Central Appraisal District's appraisal of Melton's property and Appellee's appraisal of the same property forms the basis of each and every allegation made by Melton against the Appellee. The Appraisal District is required by

law to appraise all taxable property at its market value as of January 1 and found that Melton's property was worth $171,500.00 in 2008, and $189,500.00 in 2009. [App. 37-38] Mims' appraisal is between fifty-eight and seventy-nine percent above the values reported by the Tom Green County Central Appraisal District. *Compare* TEX. TAX CODE § 23.01(a),(b) *with* [CR Vol.1, 104; RR Vol.2, 49:9-11]; [App. 37-38]. Property assessments that are thirty-three percent greater than the market value have been held to be grossly excessive. *Sierra Blanca Indep. Sch. Dist. v. Sierra Blanca Corp.,* 514 S.W.2d at 788 (*citing Pierce v. City of Jacksonville,* 403 S.W.2d 512 (Tex.Civ.App.–Tyler 1966, writ ref'd n.r.e.)). When a grossly excessive valuation has been made, this alone is sufficient to establish such fraud or illegality sufficient to render that valuation void. *Sierra Blanca Indep. Sch. Dist. v. Sierra Blanca Corp.,* 514 S.W.2d 782, 788 (Tex.Civ.App.–El Paso 1974, writ ref'd.).

71. Because Texas Tax Code § 23.01 provides the basis for claims against the Appellee, Mosser requested that the court take judicial notice of these statutes. [RR Vol.2, 107:10-13]. This request drew an objection from the Appellee and was sustained by the court. *See* [RR

Vol.2, 107:19-24].

72. Thus, the trial court erred in sustaining this objection, as a request for judicial notice may be made and taken at any time during the proceeding. TEX. R. EVID. 201(f); *See also Office of Pub. Util. Counsel v. Public Util. Com'n of Texas,* 878 S.W.2d 598, 600 (Tex. 1994)(holding that appellate courts can take judicial notice for the first time on appeal).

73. This error constitutes an abuse of discretion, as a court has no discretion to refuse a request for judicial notice if requested by a party and is supplied with the necessary information. *See* TEX. R. EVID. 201(d); *Office of Pub. Util. Counsel v. Public Util. Com'n of Texas,* 878 S.W.2d at 600 (Tex. 1994). Mosser made his request during the sanctions proceeding, and provided the judge with a substantial recitation of the statute for which he requested judicial notice. [RR Vol.2, 107: 10-13; 108: 1-5].

74. This abuse of discretion is compounded by the fact that the court's refusal to take judicial notice of the statutes caused the court to then fail entirely to apply these statutes to the sanctions question. When determining legal principles, the trial court has no discretion to

misinterpret or misapply the law. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992). Thus, a clear failure to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

75. The failure to take judicial notice was harmful error and grounds for reversal, as the failure to consider the statutes prevented the consideration of facts and the relevant cases which provide the good faith basis for the allegations made by Appellant James Mosser and subsequently Alexis Steinberg on behalf of Ben Melton in all petitions filed in this case. The original petition states that Colonial, a Division of Colonial Savings, F.A. violated the Texas Constitution by lending in excess of eighty percent of the fair market value of the home and that Appellee Mims "*aided* Colonial and Defendant Western Title in the execution of this violation by providing a false and fraudulent residential real estate appraisal" [CR Vol. 1, 8] (emphasis added). This statement incorporates the Texas Tax Code and the Tom Green County Central Appraisal District's assessments of Melton's property as the good faith basis for the extension of per se appraisal fraud to be applied to private appraisers. *See* TEX. TAX CODE § 23.01(a),(b); *see also Sierra Blanca Indep. Sch. Dist.,* 514 S.W.2d at

27

788.

76. Furthermore, by pleading that the Appellee's actions were instrumental to the writing of the unconstitutional extension of credit, James C. Mosser put the Appellee on notice of the damages that Melton sought from him: joint liability for the forfeiture of the principal and interest and repayment of sums tendered by Melton to Colonial on the unconstitutional note as well as attorney's fees. *Compare* [CR Vol. 1, 9] *with* TEX. CIV. PRAC & REM CODE § 37.009; *See also City of Fort Worth v. Pippen,* 439 S.W.2d 660, 668 (Tex. 1969) (affirming joint and several liability for aiding and abetting). All four petitions maintained this claim against the Appellee, with each successive claim expounding on the Appellee's role in the unconstitutional extension of credit. [CR Vol 1, 8 at ¶11(b), (f); 24 at ¶ 6(b), (f); 34-36 at ¶6(b)-(e), (i); 258 at ¶6(b)-(e), (I)]. As if to drive the point home, the original petition and each successive petition prayed for forfeiture of the principal and interest under the loan, and especially for "a judgment from and against the defendants for *payment of all principal and interest paid by the Plaintiffs to the Defendant to date, together with prejudgment and post judgment*

28

*interest as allowed by law."* [CR Vol. 1, 11 at ¶ 27]. (emphasis added).

77. Thus, the trial court abused its discretion in erroneously finding that "the four petitions filed in this cause have not alleged any claim or cause of action against Mims that would or could have resulted in an award of monetary damages against Bob Mims." [CR Vol.1, 426 at ¶ 44.] The record evidence clearly and unmistakably demonstrates that Melton sought joint and several liability for Appellee's role in the making of the unconstitutional extension of credit. *See e.g.* [CR Vol. 1, 11 at ¶ 27]. This presents a second ground for reversal of the sanctions, as the trial court based its finding on a clearly erroneous assessment of the evidence. *See Bennett v. Grant,* 460 S.W.3d at 255.

### MELTON'S FRAUD IN A REAL ESTATE TRANSACTION CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT

78. As a threshold matter, the court also abused its discretion in finding that there was no basis in law or a good-faith argument for the extension or modification of existing law to assert a claim of fraud in a real estate transaction against Appellee. *See* [CR Vol 1, 426 at ¶ 49]. Relying solely on the one case cited by Appellee in its motion

for summary judgment, the court found that fraud in a real estate transaction is not an available remedy in a home equity loan transaction. [CR Vol. 1, 175; 425] (citing *Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex.App–Waco 2000, pet. denied)). That case is distinguishable from the instant case as it arose out of a construction loan made in 1995, three years prior to the passing of the constitutional amendment that permitted the extension of credit secured by the homestead, which is at issue here. *See Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 610 (Tex.App–Waco 2000, pet. denied).

79.    More importantly, although one other court has found that extensions of credit secured by a homestead are outside the scope of this statute, that court relied on *Plunkett* which in turn relied on an interpretation of Texas Business and Commerce Code Section 27.01 that had been superseded by legislative amendment. *See Hansberger v. EMC Mortg. Corp.,* Docket No. 04-08-00438-CV, 2009 WL 2264996 at *4 (Tex.App.–San Antonio 2009, no pet.) (*citing Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex.App–Waco 2000, pet. denied) *and Greenway Bank & Trust v.*

30

*Smith,* 679 S.W.2d 592, 596 (Tex.App.–Houston [1ˢᵗ Dist.] 1984, writ ref'd n.r.e)).

80.   The *Greenway* court ruled that the statute did not apply to loan transactions because the measure of actual damages in the statute was defined as "the difference between the value of the real estate or stock as represented or promised, and its actual value in the condition in which it is delivered at the time of contract." *Greenway Bank & Trust v. Smith,* 679 S.W.2d 592, 596 (Tex.App.–Houston [1ˢᵗ Dist.] 1984, writ ref'd n.r.e). The prior version of the statute had this language in 1972, when the events giving rise to *Greenway* took place. *See id.* (*citing* (R.S. Art. 4004, sen. 1, 3, and 4) Acts 1967, 60ᵗʰ Leg. vol. 2, p. 2343, ch 785, Sec. 1.).

81.   The Texas Legislature struck this language and any other reference to physical real estate from the statute, leaving only the phrase "fraud in a transaction involving real estate or stock...consists of..." Act of May 28, 1983, 68ᵗʰ Leg. R.S., ch. 949, 1983 Gen. Laws. 5208 (current version at TEX. BUS. & COM. CODE § 27.01(b)). This legislative action makes reliance on *Greenway* untenable, as it was decided based on statutory language that no longer exists. *See id.*

31

Thus, nothing in the plain language of the statute as it existed in 2013 barred an unconstitutional extension of credit from falling within the ambit of a "transaction involving real estate," such that there was a good faith basis for arguing for the reversal of those cases whose holdings were based on reading of the law that had been superseded by legislative enactment. *See* TEX. BUS. & COM. CODE § 27.01; *See also* TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001(2). Thus, to the extent that the court granted sanctions on this issue, the court abused its discretion in finding that this cause was groundless when pleaded.

82. Furthermore, the evidence is insufficient to find that Melton's Fraud in a Real Estate Transaction Claim was "groundless" when raised in the Original, First, and Second Amended Petitions. To prove fraud in a real estate transaction, a plaintiff must show that there was a false representation of a past or existing material fact when the false representation is made to the plaintiff for the purpose of inducing the plaintiff to enter into a contract, and the false representation was relied on by the plaintiff in entering into that contract. TEX. BUS. & COM. CODE § 27.01(a)(1).

83. As previously stated, the Appellee's appraisal was between fifty-eight and seventy-nine percent above the values reported by the Tom Green County Central Appraisal District. *Compare* TEX. TAX CODE § 23.01(a),(b) *with* [CR Vol. 1, 104; RR Vol. 2, 49: 9-11]; [Appendix at 37-38]. Property assessments that are thirty-three percent greater than the market value have been held to be grossly excessive, which alone is sufficient to establish such fraud or illegality sufficient to render that valuation void. *Sierra Blanca Indep. Sch. Dist. v. Sierra Blanca Corp.,* 514 S.W.2d at 788. Thus, at the time of the original pleading, Mosser had sufficient grounds for pleading that the appraisal was false and fraudulent and incorrectly represented a then existing material fact.

84. Despite Appellee's claims to the contrary and the trial court's ultimate ruling, actions against appraisers can be maintained in Texas as an appraiser's opinion that he knows to be false is actionable. *Compare* [CR Vol. 1, 175] ("Ben Melton's statutory fraud claim is based upon Bob Mims' opinion of market value in a real estate appraisal, which is not an actionable representation under Texas law."); [CR Vol. 1, 425] ("no basis in law or fact to assert a claim or cause of action against

Mims for fraud in a real estate transaction.") *with Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)("An opinion may constitute fraud if the speaker has knowledge of its falsity."). Even the authority that Appellee cited for this proposition acknowledges that knowledge of an opinion's falsity is an exception to the general rule that opinions of value are not actionable. *Transport Insurance Company v. Faircloth,* 898 S.W.2d 269, 276 (Tex. 1995). Based on the wide disparity between the value reported by Appellee and the Tom Green County CAD, and the fact that Appellee knew about the value reported by the Tom Green County CAD, pursuing this theory of the case was not groundless. Thus, the Trial Court abused its discretion by failing to properly analyze the law as to falsity of opinions in cases involving misrepresentation, warranting reversal on this issue.

85. As to the second element of fraud in a real estate transaction, the appraisal value removed the only impediment to Melton's extension of credit, such that the appraisal induced his agreement to the terms, and he could not have entered into an extension of credit with Colonial had the value been that reported by the Tom Green County Central Appraisal District. *See* TEX. CONST. ART. XVI §§

50(a)(6)(Q)(ix); (h); *see also* [CR Vol. 1, 249 at ¶ 32].

86. The record evidence also makes it clear that Melton relied on the appraisal in obtaining an extension of credit secured by his homestead. The uncontradicted evidence establishes that Ben Melton paid the Appellee $350.00 by check to perform a property appraisal. CR 1:100-101 ("POC (B)"); [RR Vol. 2, 65:19-22; RR Vol. 3, 75 at ¶ 6-8];. The Appellee may claim to have prepared the appraisal for Colonial alone, but Colonial made Melton its assignee of the information contained in the appraisal when it disclosed the appraisal value to him so that he could sign the acknowledgment of fair market value as $300,000.00. *Compare* [RR Vol. 2, 47:16-17] *with* [RR Vol.3, 34]. ("The fair market value indicated herein is the value estimated in the appraisal which was prepared in accordance with state or federal requirements applicable to this extension of credit.").

87. The Appellee further testified that his appraisal could be relied upon by an assignee of Colonial, yet later testified that Melton was not entitled to rely on the appraisal. *Compare* [RR Vol.2, 48:21-23] *with* [RR Vol 2, 56:18-20]. Mosser properly and timely objected to this

testimony as misstating the facts. [RR Vol 2, 56:21-22]. In overruling the objection, the court directed Mosser's attention to language in the appraisal stating, "No other use or users of this report are permitted," but failed entirely to realize that CU Members Mortgage had the right to divulge the information to any of its assigns. *Compare* [RR Vol. 2, 57:15-16] *with* [RR Vol. 3, 62] ("The intended user of the report is CU Members Mortgage *and/or its assigns*. No other use or users of this report are permitted.")(emphasis added).

88. To the extent the court adopted Appellee's argument that Melton could not by law rely on Appellee's appraisal, the court erred in finding no basis in law for Melton's fraud in a real estate transaction claim. Appellee cited *Westcliff Co. v. Wall,* 267 S.W.2d 544, 546 (Tex.1954), for the proposition that only Colonial could rely on the appraisal. [CR Vol.1, 175]. The Supreme Court of Texas has expressly disapproved of using *Westcliff* in this way, as the jurisprudence of Texas authorizes a fraud claim "if the false representations be made with a view of reaching the third person to whom it is repeated, and for the purpose of influencing him." *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 578 (Tex.

2001). The Supreme Court of Texas stated that Texas jurisprudence is entirely consistent with the Restatement Second of Torts's "reason-to-expect" standard, which states that a person who makes a misrepresentation is liable to the class of persons the maker intends or has reason to expect will act in reliance upon the misrepresentation. *Id. at* 578-79. Furthermore, the Court expressly held that a defendant who acts with knowledge that a result will follow is considered to intend the result. *Id. at* 579.

89. The facts establish that Ben Melton paid Appellee for the Appraisal, [CR Vol. 1, 100-101 ("POC (B)"); RR Vol. 3, 75 at ¶ 6-8; RR Vol. 2, 65:19-22]; that Appellee submitted the completed Appraisal to Colonial, [RR Vol. 2, 47:13-17]; and that Ben Melton relied on the appraisal when signing the acknowledgment of fair market value, [RR Vol. 3, 34]. It is also clear that the Appellee knew that Colonial would not be the only party relying on the appraisal, as the specific terms of use of the appraisal altered the boiler-plate language of the appraisal to allow for assigns of Colonial to rely on the appraisal. *Compare* [RR Vol. 3, 58] ("Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting

37

conditions are not permitted") *with* [RR Vol. 3, 62] ("The intended user of the report is CU Member's Mortgage and/or its assigns"). Thus, the record evidence and the case law available to Mosser at the time of the Original, First, and Second Amended Petitions shows that Mosser had a good faith basis in law and fact for pleading under Texas Business Code Section 27.01, such that the court clearly erred in finding otherwise.

90. That Steinberg would ultimately nonsuit this claim in the Third Amended Petition as "unsupportable" does not establish that the claim was groundless and lacked merit when initially brought. [CR Vol. 1, 216]. Her replacement of the claim with a common law fraud claim based on the same facts, substantially the same elements, and substantially the same means of recovery indicates a tactical decision to remove any doubt as to claim being made, rather than an admission that the claim had no merit when brought. *Compare* [CR Vol.1, 37-38] *with* [CR Vol. 1, 261-62]; *See also* TEX. CIV. PRAC & REM. CODE § 41.003(a)(1) (authorizing exemplary damages for common law fraud claims).

91. Thus, this error by the trial court constitutes an abuse of discretion,

as the court's reading of the evidence and the law is clearly erroneous such that it should not have concluded that there was no basis in law or fact to assert a claim of fraud in a real estate transaction. *See Bennett v. Grant,* 460 S.W.3d at 255. This court should sustain this point, and reverse the trial court's award of sanctions on this issue.

## MELTON'S COMMON LAW FRAUD CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT

92.    As a threshold matter, neither James C. Mosser nor Mosser Law, PLLC, signed a pleading that contained this cause of action and therefore may not be sanctioned under either Chapter 10 or Rule 13, as only the attorney that signed the offensive pleading may be sanctioned. *Yuen v. Gerson,* 342 S.W.3d 824, 828 (Tex.App.–Houston [14th Dist.], pet. denied.). If this court declines to follow *Yuen v. Gerson,* then Mosser argues alternatively that sanctions awarded pursuant to Melton's common law fraud claim, like the sanctions awarded for Melton's fraud in a real estate transaction, fail because the claim was not groundless when made.

93.    A plaintiff proves common law fraud by establishing that the defendant made a material representation that was false; the

defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; the defendant intended to induce the plaintiff to act upon the representation, and the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d at 577. As stated above, the facts establish that Ben Melton paid Appellee for the Appraisal, [CR Vol. 1, 100-101 ("POC (B)"); RR Vol. 3, 75 at ¶ 6-8; RR Vol. 2, 65: 19-22; that Appellee submitted the completed Appraisal which valued Melton's property at $300,000.00 to Colonial, [RR Vol. 2, 47:13-17]; that Appellee knew of widely conflicting appraisal values required by law to be the fair market value of Melton's property, [RR Vol. 2, 67:9-11; RR Vol.3, 37]; and that Ben Melton relied on the appraisal when signing the acknowledgment of fair market value, [RR Vol. 3, 34]. These facts, which constitute prima facie fraud, were known by Steinberg at the time she filed the Third Amended Petition. [CR Vol. 1, 257-266].

94. In its sanctions order, the trial court ruled that Ben Melton did not have a viable claim or cause of action against Bob Mims for common law fraud because Bob Mims did not make a false representation of a

material fact. [CR Vol. 1, 425 at ¶41]. To the extent that the trial court heard Appellee's testimony and made this determination, it erred because it ruled on the merits of the fraud claim and considered evidence that was not available to Steinberg at the time she filed the Third Amended Petition. *See Robson v. Gilbreath,* 267 S.W.3d 401, 409 (Tex.App.–Austin 2008, pet. denied). This error constitutes an abuse of discretion warranting reversal because the evidence is legally insufficient to establish that Steinberg knew the Appellee's representation was not factually false when she filed the Third Amended Petition. *See City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

95. Conversely, if the trial court ruled as a matter of law that the appraisal could not have constituted an actionable misrepresentation of a material fact, as Appellee argued in its Second Motion for Summary Judgment, the trial court erroneously interpreted the law by failing to consider that statements of opinion are actionable if the speaker knows that they are false at the time they are made. *Transport Insurance Company v. Faircloth,* 898 S.W.2d 269, 276 (Tex. 1995). This also constitutes an abuse of discretion warranting

reversal, as the court clearly failed to analyze or apply the law as it failed to consider this legal theory when considering whether to sanction Mosser. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992).

96. Finally, to the extent that the court granted summary judgment and subsequently Appellee's motion for sanctions on the basis of Appellee's erroneous application of *Westcliff* to this case, the trial court abused its discretion by reaching an erroneous legal conclusion as to who may properly plead fraud. Again, the Texas Supreme Court has stated that persons who rely on misrepresentations transmitted to them by an intermediary have a cause of action against the person who originally made the misrepresentation if that person knew or should have known that others would rely on the misrepresentations. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d at 578. Because Melton fit this definition, Steinberg had a good faith basis for pleading common law fraud on his behalf in the Third Amended Petition, such that the trial court's finding that there was no basis in law or fact to assert a common law fraud claim constitutes an abuse of discretion warranting reversal.

97.  The trial court further abused its discretion in awarding sanctions on the basis that Melton's Deceptive Trade Practices Act (DTPA) claim was "groundless." [CR Vol. 1, 425 at ¶ 40]. Under the DTPA, a plaintiff may recover if the plaintiff is a consumer; if the defendant may be sued under the DTPA; the defendant's action or course of action was unconscionable; and the defendant's action was a producing cause of the plaintiff's damages. *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex. 1996).

98.  The trial court incorrectly concluded that sanctions were appropriate against Mosser on the basis that Melton could never qualify as a consumer. [CR Vol 1, 425]. Under the act, an individual who seeks or acquires goods or services by purchase or lease. TEX. BUS. & COM. CODE § 17.45(4). As previously stated, the facts establish that Ben Melton paid Appellee for the appraisal, thereby acquiring his services. [CR Vol. 1, 100-101 ("POC (B)"); RR Vol. 3, 75 at ¶ 6-8; RR Vol. 2,  65:19-22].

99.  Furthermore, the goods or services acquired were of a type that were actionable. Mosser agrees that extensions of credit are too intangible

to constitute goods or services for the purposes of the DTPA. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex. 1983). However, as stated in Melton's reply to Appellee's Motion for Summary Judgment, Melton did not seek an extension of credit from Appellee; rather, Melton sought an appraisal of his homestead, for which he paid Appellee $350.00. [CR Vol. 1, 270-271]. In fact, Mosser never raised the DTPA claim in connection with the extension of credit, instead focusing the claim entirely on Appellee and his appraisal services. [CR Vol. 1, 26-27; 38; 262-63].

100. Appellee also had capacity to be sued because the claim as pleaded places him outside the ambit of the professional services exemption to the DTPA. The Act exempts "claims for damages based on rendering of professional services, the essence of which is providing advice, judgment, opinion, or similar professional skill." TEX. BUS. & COM. CODE § 17.49(c). This exemption however does not apply to an express misrepresentation of a material fact that cannot be characterized as advice, judgment or opinion; or an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion. TEX. BUS. & COM. CODE § 17.49(c)(1),(3).

44

101. Mosser pleaded the exceptions to the exemption, as facts known to him at the time of the pleading establish that Appellee's appraisal was between fifty-eight and seventy-nine percent above the values reported by the Tom Green County Central Appraisal District, so as to render the opinion rendered potentially false and unconscionable. *Compare* TEX. TAX CODE § 23.01(a),(b) *with* [CR Vol. 1, 104; RR Vol. 2, 49:9-11]; [App. 37-38]. Appellee never addressed the exceptions to the exemption in his motion for summary judgment, instead arguing for an extension of the exemption to appraisers which, even if it were available to real estate appraisers, would have no preclusive effect on a claim raised on Appellee's knowledge that his opinion of the value of Melton's homestead was severely inflated. *See Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex. 1998) (holding an attorney, a professional, liable for an unconscionable act or course of action.). Even Appellee's case law cited in his motion for summary judgment for an extension of the professional services exemption to appraisers acknowledges that there are exceptions to the exemption. *See Retherford v. Castro,* 378 S.W.3d 29, 37 (Tex.App.–Waco 2012, pet. denied) (In determining whether the Castro's misrepresentation

45

claim is barred by the professional services exemption *or meets one of the exceptions to the exemption.*")(emphasis added); [CR Vol. 1, 176-77]. Thus, the court erred in interpreting the law by failing to analyze whether Mosser pleaded an exception to the professional services exemption, such that the trial court abused its discretion in finding that there was no basis in law or fact to assert a DTPA claim against Appellee. Reversal on this point is warranted.

## MELTON'S BREACH OF CONTRACT CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT

102. As a threshold matter, neither James C. Mosser nor Mosser Law, PLLC, signed a pleading that contained this cause of action and therefore may not be sanctioned under either Chapter 10 or Rule 13, as only the attorney that signed the offensive pleading may be sanctioned. *Yuen v. Gerson,* 342 S.W.3d 824, 828 (Tex.App.–Houston [14th Dist.], pet. denied.). If this court declines to follow *Yuen v. Gerson,* then Mosser argues alternatively that the sanctions awarded in response to Melton's breach of contract claim fail as a matter of law.

103. Breach of contract may be established by showing the existence of a valid contract, performance or tendered performance by the plaintiff,

breach of the contract by the defendant, and damages sustained by the plaintiff as a result of the breach. *Valero Marketing & Supply Co. v. Kalama Intern.* 51 S.W.3d 345, 351 (Tex.App.–Houston [1st Dist.] 2001, rehearing overruled). Additionally, the plaintiff must establish that it is the proper party to commence the suit. *Mandell v. Hamman Oil & Ref. Co.,* 822 S.W.2d 153, 161 (Tex.App.–Houston [1st Dist.] 1991, writ denied).

104. In its second motion for summary judgment, which formed the basis for the trial court's award of sanctions, the Appellee conceded that there was a valid contract, and that Colonial had tendered performance on the contract through Ben Melton's payment of $350.00 to the Appellee. *Compare* [CR Vol. 1, 312] *with* [*Id.,* 425 at ¶42]. The trial court ultimately ruled that the claim was "groundless" when brought because Ben Melton never could have been the third party beneficiary of the contract between Colonial and Appellee, based on an erroneous interpretation of the evidence. [CR Vol.1, 425 at ¶ 42]. The record evidence establishes that Colonial transmitted an appraisal order form that specifically identified Ben Melton as the borrower in a loan transaction dependent on the

results of the appraisal that properly reflected the fair market value of Melton's property. [RR Vol. 3, 35]. The evidence also establishes that the price paid for the appraisal was $350.00, and that Appellee performed the appraisal knowing that the appraisal would directly benefit Melton as the borrower in the transaction. [CR Vol. 1, 105], [RR Vol. 3, 51]. Thus, the evidence demonstrates that Mosser has a good faith basis for arguing that Melton was a third party beneficiary to this contract, as both the Appellee and Colonial intended that the appraisal benefit Ben Melton, as it would form the basis of his loan, and that both parties entered the contract directly for the benefit of Melton. *See Basic Capital Management, Inc. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 900 (Tex. 2001).

105. Thus, the court abused its discretion in ruling that the claim was groundless and lacked evidentiary support when brought, such that reversal is warranted on this issue.

106. Furthermore, the court appears to have accepted that there was no breach as the Appellee fully performed his obligations under the contract. The record evidence demonstrates that there was a genuine issue of material fact on this point, as the contract was for

48

Appellee's opinion of the fair market value of Melton's property, not a value that grossly exceeded the values determined by the Tom Green County Central Appraisal District's determination of fair market value on the same property. Thus, the court abused its discretion in determining that there was no basis in law or in fact to assert a breach of contract on this issue, such that reversal is warranted.

107. Finally, the court also erred in determining that Melton suffered no damages or injury as a result of a breach of contract. The record evidence establishes that Ben Melton tendered $350.00 for the appraisal, which was to properly reflect fair market value of the property. [RR Vol. 3: 51; 75 at ¶ 6,7]. This is the adequate measure of damages under breach of contract known to Steinberg at the time she filed this pleading. Thus, the court clearly erroneously assessed the evidence on this issue, such that reversal is warranted under an abuse of discretion standard.

**MELTON'S NEGLIGENCE CLAIM WAS NOT GROUNDLESS AND HAD EVIDENTIARY SUPPORT**

108. As a threshold matter to this claim, neither James C. Mosser nor Mosser Law, PLLC, signed a pleading that contained this cause of action and therefore may not be sanctioned under either Chapter 10

49

or Rule 13, as only the attorney that signed the offensive pleading may be sanctioned. *Yuen v. Gerson,* 342 S.W.3d 824, 828 (Tex.App.–Houston [14th Dist.], pet. denied.). If this court declines to follow *Yuen v. Gerson,* then Mosser argues alternatively that sanctions awarded pursuant to Melton's negligence claim fail because the claim was not groundless when made.

109. The trial court ruled that because Appellee owed no legal duty to Melton, the claim was groundless when brought as there was no basis in law or fact for bringing the claim and there was no good faith argument for the extension, modification, or reversal of existing law. The trial court failed to analyze the law properly for it to have arrived at this conclusion. The Supreme Court of Texas has held that with every contract, there is a common law duty to perform it with care, skill, reasonable expedience, and faithfulness. *Southwestern Bell Tel. Co. V. DeLanney,* 809 S.W.2d 493, 494 (Tex. 1991). Furthermore, a contract for professional services creates a duty that the professional exercise the degree of care, skill, and competence that reasonably competent members of the profession would exercise under similar circumstances. *Dukes v. Philip Johnson/Alan Ritchie Architects,*

*P.C.,* 252 S.W.3d 586, 594 (Tex.App.–Fort Worth 2008, pet. denied). The trial court's logic thus fails in concluding simultaneously that Appellee could qualify for the professional services exemption under the DTPA and that Appellee owed no duty under a contract for professional services to Melton. *Compare* [CR Vol. 1, 425 at ¶ 40] *with* [CR Vol. 1, 426 at ¶ 43].

110. Steinberg had a good faith basis in pleading negligence, as it is clear that Appellee could have and did owe a duty to both Melton and Colonial to perform appraisals with the degree of care, skill, and competence that reasonably competent appraiser would exercise under reasonable circumstances. *Dukes,* 252 S.W.3d at 594. The facts known to Steinberg at the time tend to indicate that the Appellee breached this duty, as the appraisers for the Tom Green County Central Appraisal District are bound to perform appraisals in the same manner as Appellee, yet their valuations of Melton's property were significantly less than that proposed by the Appellee. [CR Vol. 1, 104]; [RR Vol. 2, 49: 9-11]; [App.37-38]. Furthermore, Appellee's appraisal was the proximate cause of Melton's damages, as it permitted the funding of an unconstitutional extension of credit

51

secured by Melton's homestead, such that Melton suffered damages in the form of both a lien enabling alienation of his homestead and principal and interest paid under that loan to Colonial, which was aided by the Appellee's tortious acts. *See City of Fort Worth v. Pippen,* 439 S.W.2d 660, 668 (Tex. 1969) (affirming joint and several liability for aiding and abetting).

111. Thus, the trial court abused its discretion in failing to properly apply or analyze the law as it pertains to duties arising from a contract for professional services, such that reversal on this issue is also warranted. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992); *Bennett v. Grant,* 460 S.W.3d 220, 255 (Tex.App.–Austin 2015, pet. filed).

### THE TRIAL COURT ABUSED ITS DISCRETION IN SANCTIONING MOSSER FOR BRINGING ALLEGEDLY TIME-BARRED CLAIMS AGAINST APPELLEE

112. Finally, the court erred in sanctioning Mosser under both Rule 13 and Chapter 10 for arguing for the delayed accrual of all of Melton's claims.

113. The trial court's sanctions order states, "All of the claims and causes of action asserted against Bob Mims in the petitions filed in this cause are barred by the applicable statute of limitations." [CR Vol. 1,

52

425]. This is based in large part on its orders granting summary judgment in favor of Appellee on all causes, in which Appellee argued that limitations barred recovery on all of Melton's claims. [CR Vol. 2, 19]; [CR Vol. 1, 428-29]. Because it is questionable whether Summary Judgment should have been granted at all on this issue, sanctions are inappropriate against Mosser or Mosser Law PLLC as a matter of law.

114. When filing a motion for summary judgment, the movant bears the burden of proof and *all doubts about the existence of a genuine issue are resolved against the movant. Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548-49 (Tex. 1985)(emphasis added).

115. Furthermore, all evidence and any reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id. at* 548-49.

116. Most importantly, all conflicts in the evidence are disregarded, and the evidence which tends to support the position of the party opposing the motion *is accepted as true.* Evidence favoring the movant's position *will not be considered* unless it is uncontradicted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965)(emphasis added).

117. A defendant moving for summary judgment on limitations must conclusively prove when the cause of action accrued and negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence, should have discovered the nature of its injury. *KPMG Peat Marwick v. Harrison County Housing Finance Corp.,* 988 S.W.2d 746, 748 (Tex. 1999).

118. Likewise, a party moving for sanctions based on limitations bears the burden of proving that the nonmovant's pleading of the discovery rule was groundless and filed in bad faith and for purpose of harassment. *Dolenz v. Boundy,* 197 S.W.3d 416, 421 (Tex.App.–Dallas 2006, pet. denied).

119. Mosser plead fraud as an element of every pleading filed in this case on which his signatures appears in the signature block. [CR Vol. 1, 10 at ¶21; 24 at ¶ 6(b), (f); 36 at ¶ 6(I)].

120. In its response to Colonial and Appellee's first motions for summary judgment, Steinberg amended Melton's petition, pleaded the discovery rule, and Mosser filed the affidavit of Ben Melton with the

response to both Colonial's and Appellee's Motions for Summary Judgment. [CR Vol. 1, 246-250; 279-283].

121. Colonial responded, "Plaintiff does not understand that limitations began to run when he suffered his alleged injury, not when he knew about it...Here, Plaintiff when he closed his loan had all of the information he needed to determine whether or not he suffered a legal injury." [CR Vol. 3, 9]. Appellee, for his part, simply adopted and incorporated this argument, in addition to making several conclusory statements that the discovery rule did not apply here. [CR Vol. 2, 6-7].

122. Neither Colonial nor Appellee offered any documentary evidence or statements establishing that Ben Melton knew or should have known of any legal injury accruing on the date the loan closed. Both parties simply asserted that case law establishes that the accrual date of all injuries was the date that the loan closed, March 13, 2009. [CR Vol. 3, 9] (citing *Schanzle v. JPMC Specialty Mortg. LLC,* No. 03-09-00639-CV, 2011, 2011 Tex. App. LEXIS 1748 *10 (Tex.App.–Austin Mar. 11, 2011, no pet.); *Hannaway v. Deutsche Bank Nat'l Trust Co.,* A-10-CV-714-LY, 2011 U.S. Dist. Lexis 24775 *8 (W.D. Tex, Mar. 11,

2011)). The only document that even indicates that Ben Melton might have been aware of the value of the homestead is the Fair Market Value Acknowledgment, and that document reinforces the notion that Melton had "no knowledge or reason to believe that the fair market value of the Homestead Property stated in this acknowledgment is incorrect" at the time the loan closed. *See* [CR Vol. 1, 94]. Nothing in the summary judgment evidence offered by either Appellee or Colonial indicates that Melton received a copy of the appraisal at closing, which would have provided him with the proper means to discover an injury. *See* [CR Vol. 1, 55-168; 180-215].

123. Additionally, neither of the cases cited by Appellee and Colonial is binding authority on the issue of fraudulently prepared appraisals. *Schanzle* does not address the discovery rule, instead generally concluding that a four-year statute of limitations applies to claims made under Article 16 Section 50 of the Texas Constitution as the appellant in that case failed to plead the discovery rule or fraud. *Schanzle v. JPMC Specialty Mortg. LLC,* No. 03-09-00639-CV, 2011, 2011 WL 832170 at *4 (Tex.App.–Austin Mar. 11, 2011, no pet.) *Hannaway* is a ruling from a United States District Court which was

not binding authority on the trial court, and which improperly conflated claims sounding in fraud with the discovery rule. *Compare Hannaway v. Deutsche Bank Nat'l Trust Co.,* A-10-CV-714-LY, 2011 WL 891669 at *5 (W.D. Tex, Mar. 11, 2011) (citing *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996) with *S.V. v. R.V.* 933 S.W.2d 1, 6 (Tex. 1996) ("Restated, the general principle is this: *accrual of a cause of action is deferred in cases of fraud* or in which the wrongdoing is fraudulently concealed, and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified.")(emphasis added).

124. In direct contrast and in response to the two motions for summary judgment, Mosser filed Melton's affidavit which states that Melton received documents at the loan's 2009 closing that were incomplete, that he ultimately lost employment in 2012 which led to him seeking modification options of his extension of credit and to him investigating the whole loan closing in July of that year, and that he sought the final executed copies of the documents from Mortgage Electronic Registration Systems in both July 2012, and February 2013. [CR Vol.

1, 330-332 at ¶ 16-23]. No evidence presented by either Appellee or Colonial rebutted this. *See generally* [CR Vol. 1, 55-168; 180-215].

125. Thus, the evidence before the court certainly raised a fact question on when Melton knew or should have known there was a serious problem with the appraisal, such that summary judgment as a matter of law on Melton's Constitutional, statutory fraud, and DTPA claims was inappropriate. *See Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965); *See also* TEX. BUS. & COM. CODE § 17.565 ("All actions brought under this subchapter must be commenced...within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."). More importantly, this fact question demonstrates that Mosser had some basis in fact for pleading deferral of accrual of Melton's claims, such that the trial court clearly abused its discretion in finding that the pleadings Mosser signed were "groundless." The dearth of substantive case law on this issue also demonstrates that Mosser's pleading of fraud and Steinberg's pleading of the discovery rule were warranted by good faith argument

58

for the extension of existing law, such that the trial court abused its discretion in finding otherwise.

126. The trial court's finding that Melton's common law fraud, breach of contract, and negligence claims were time-barred and warranted sanctions is also wrong. Appellee's arguments in his Second Motion for Summary Judgment improperly conflate the discovery rule with claims sounding in fraud. *Compare* [CR Vol. 1, 309-310] *with S.V. v. R.V.* 933 S.W.2d 1, 6 (Tex. 1996) ("Fraud, we have said, in and of itself prevents running of the statute of limitations."). Appellee offered no evidence to show when Melton knew or should have known of the accrual of his cause, such that he did not conclusively negate the deferral of the fraud claims or the discovery rule. Compare [CR Vol. 1, 309-310] *with KPMG Peat Marwick v. Harrison County Housing Finance Corp.,* 988 S.W.2d 746, 748 (Tex. 1999).

127. Although the court refused to consider Melton's properly mailed response to Appellee's Second Motion for Summary Judgment, the Appellee himself introduced Melton's affidavit in support of the response to Appellee's Second Motion for Summary Judgment into evidence at the sanctions hearing. [RR Vol. 2, 51:10-20]; [RR Vol. 3,

74-78]. Like the affidavit offered in response to Appellee's first Motion for Summary Judgment, this affidavit also states that Melton did not discover the issues with the appraisal undergirding his extension of credit until July 2012. [RR Vol. 3, 76-77 at ¶ 16-23].

128. Rather than rebutting these statements, the testimony adduced at the hearing reinforces the notion that Melton never received a copy of the appraisal from which he could have discovered a legal injury. *See* [RR Vol. 2, 61:11-18]. No other evidence adduced at the hearing, or presented by Appellee rebuts Melton's pleading of fraud or the discovery rule. *See generally* [RR Vol. 2, 1-113]. Thus, the only evidence offered in support of sanctions against Mosser for pleading fraud and the discovery rule as grounds to defer accrual of Melton's claims actually militates against sanctions, as the evidence shows that Mosser and Steinberg had a basis in fact for filing such pleadings. [RR Vol. 2, 51:8-20, 61:11-18], [RR Vol. 3, 74-78]. The evidence was legally insufficient to provide a basis for the court to award sanctions against Mosser for bringing claims that were allegedly time-barred such that the trial court abused its discretion in awarding the sanctions. *See City of Keller v. Wilson,* 168 S.W.3d

802, 810 (Tex.2005); *See also Bennett v. Grant,* 460 S.W.3d 220, 255 (Tex.App.–Austin 2015, pet. filed).

### THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE PLEADINGS WERE BROUGHT FOR AN IMPROPER PURPOSE

129. In addition to demonstrating that the claims filed by Mosser on behalf of Melton were "groundless," the Appellee also has the burden of proving that the claims were brought in bad faith or for the purpose of harassment to prevail on a motion for sanctions. TEX. R. CIV. P. 13. Sanctions under Rule 13 require a showing of bad faith, or the conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose. *Lake Travis Indep. Sch. Dist. v. Lovelace,* 243 S.W.3d at 256 (*citing Stites v. Gillum,* 872 S.W.2d 786, 794-96 (Tex.App.–Fort Worth 1994, writ denied). Improper motive is an essential element of bad faith. *Robson v. Gilbreath,* 267 S.W.3d 401, 407 (Tex.App.–Austin 2008, pet.denied). Harassment in the context of Rule 13 means that the pleading was intended to annoy, alarm, and abuse another person. *State v. PR Investments and Specialty Retailers, Inc.,* 180 S.W.3d 654, 670 (Tex.App.–Houston [14th Dist.] 2005, pet. granted). When reviewing a sanctions order under Chapter 10.001 of the Texas Civil Practices and Remedies Code,

61

courts construe the phrase "improper purpose" as the equivalent of "bad faith" under rule 13. *Dike v. Peltier Chevrolet, Inc.,* 343 S.W.3d 179, 196 (Tex.App.–Texarkana 2011, no pet.). The evidence is legally insufficient to support the trial court's conclusion that these proceedings were filed in bad faith or for the purpose of harassment such that the trial court abused its discretion in making such a finding.

130. The court erred in awarding sanctions pursuant to Texas Civil Practice and Remedies Code Chapter 10 or Rule 13, as the Appellee wholly failed to plead an improper purpose in its motion for sanctions. The motion itself contains a recitation of facts and the bald assertion, "The petitions and pleadings in this cause filed against Bob Mims have been intended to harass or cause unnecessary delay or needless increase in the cost of litigation." [CR Vol. 1, 407]. Appellee wholly failed to demonstrate how the facts contained in the motion prove an improper purpose for filing suit against Appellee. *Compare* [CR Vol. 1, 407] *with* TEX. CIV. PRAC. & REM. CODE § 10.001.

131. Despite the deficient motion, the trial court concluded "that the primary purpose for naming Bob Mims as a defendant in this cause

62

was to defeat diversity jurisdiction and the removal of this cause to federal court," such that all pleadings filed in this case against Appellee "were brought in bad faith or were "brought for the purpose of harassment." [CR Vol. 1, 425-426 at ¶ 37, 45].

132. During the sanctions hearing and over Mosser's relevance objection, the court received into evidence all of the pleadings filed in *Priester v. Long Beach Mortgage Company and J.P. Morgan Chase,* 708 F.3d 667 (5th Cir. 2013), for the limited purpose of establishing a common scheme allegedly utilized by Mosser. [RR Vol. 2, 82: 24-25; 85:15-22]. Despite the court's insistence that it would "disregard any testimony about diversity jurisdiction or that purpose," the court ultimately and wrongly concluded that Mosser added Appellee to the suit to defeat diversity jurisdiction. *Compare* [RR Vol. 2, 85:18-20] *with* [CR Vol. 1, 425 at ¶ 37]. The evidence and the record simply do not support this assertion.

133. Because the Appellee bore the burden of overcoming the presumption that papers and pleadings are filed in good faith, the Appellee was bound to put on some evidence that diversity jurisdiction could have and would have been established in the

63

absence of the Appellee. *See Dike v. Peltier Chevrolet, Inc.,* 343 S.W.3d 179, 191 (Tex.App.–Texarkana 2011, no pet.)(citing *GTE Commc'ns Sys. Corp. v. Tanner,* 856 S.W.2d 725, 731 (Tex. 1993). Appellee failed entirely to do this at the hearing, as the testimony taken at the hearing establishes that Appellee and Melton were Texas residents but does not address Colonial or First Western Title. RR 2: 28, lines 1-4.

134. The record itself demonstrates that all parties to this litigation were Texas residents such that diversity jurisdiction could not have been established, even in Appellee's absence. The Federal District Courts have diversity jurisdiction where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs *and* is between citizens of different states. 28 U.S.C. § 1332(a)(1). There is no question that the amount in controversy requirement is met, but the diverse residency requirement cannot be met by either of the other parties to this case. As stated, Ben Melton is a Texas resident currently located in Tom Green County, Texas. [CR Vol. 1, 7 at ¶2]. By its own admission and evidence filed in support of its Motion for Summary Judgment which the court reviewed prior to granting the

Motion in its favor, Defendant Colonial was a Texas resident with its principal office located at 2600 West Freeway, Fort Worth, Texas 76102. [CR Vol. 1, 7 at ¶3; 59 at ¶ 10]. Finally, by its own admission, First Western Title is a Texas Corporation with principal office located at 2626 West Freeway, Fort Worth, Texas 76102. [CR Vol. 1, 164-68]. Disregarding for the moment Appellee and his direct connection to the case, the plaintiff and the other defendants were all Texas residents, such that the conditions to establish diversity jurisdiction could never have been met. *See* 28 U.S.C § 1332(a)(1).

135. Secondly, neither of the other defendants filed a motion to remove to this case to Federal Court. In fact, Colonial admitted that jurisdiction was proper in Texas and that the trial court had subject matter jurisdiction over this case in its original counterclaim filed in this case. [CR Vol. 1, 29-30 at ¶ 1-4]. As no diversity of residents could be established and at least one other defendant admitted both residency and subject matter jurisdiction before the Trial Court in Tom Green County, inclusion of Mims in the suit would have had no bearing on the forum of the case, such that the evidence is legally insufficient to establish that Mosser added Mims to the suit to defeat diversity

65

jurisdiction.

136. Additionally, although *Priester* and this case share a violation of Texas Constitution Article 16 Section 50, the similarities stop there. As stated above, the central claim in this case involves an extension of credit that exceeded eighty percent of the fair market value of the home, as enabled by a fraudulent appraisal. [CR Vol. 1, 8 at ¶11(b), (f); 24 at ¶ 6(b), (f); 34-36 at ¶6(b)-(e), (i); 258 at ¶6(b)-(e), (I)]. No similar claim was ever made in *Priester.* [RR Vol. 3, 90-99; 156-74; 181-207; 249-59. Secondly, Appellee was a named party to the lawsuit from the filing of the original petition as his actions would have been directly responsible for the unconstitutional extension of credit, whereas the title company and the attorney named as parties in *Priester* were named once the case was in Federal Court. *Compare* [RR. Vol. 3, 90-99] *with* [*Id.* at 156-74].

137. Finally, the trial court adduced no evidence as to the motives and credibility of James C. Mosser, the person who signed the first three petitions filed in this cause. Rule 13 generally requires that the trial court hold an evidentiary hearing to make a determination about the motives and credibility of the person signing the petition. *Dike v.*

*Peltier Chevrolet, Inc.,* 343 S.W.3d 179, 191 (Tex.App.–Texarkana 2011, no pet.). As Appellee wholly failed to call Mosser to testify regarding his reasons for filing the petition, there is no evidence in the record regarding any improper motive he may have had in filing any of the petitions that he signed. *See Dike* at 194. ("As the party having the burden of proof at the sanctions hearing, Peltier could have easily called counsel to testify regarding what inquiry, if any, was made with respect to application of the discovery rule before filing the petition.").

138. Thus, it is clear that Appellee was a necessary party to the suit as his appraisal formed the basis for the entire claim, and was not added for the supposed improper purpose of defeating diversity jurisdiction or to annoy, alarm or surprise him. The evidence shows a complete absence of any facts that would permit diversity jurisdiction to be established, such that this court should sustain a challenge to the legal sufficiency of the evidence on which the trial court based its finding that Mosser brought this suit for an improper purpose, such that sanctions under Rule 13 and Chapter 10 are inappropriate. *See City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005); *Bennett v.*

*Grant,* 460 S.W.3d 220, 255 (Tex.App.–Austin 2015, pet. filed).

**PRAYER**

The trial court's order awarding sanctions against James C. Mosser and Mosser Law PLLC weaponizes Rule 13 and Chapter 10 so as to punish those with whom the trial court disagrees intellectually or philosophically. *See Tarrant County v. Chancey*, 942 S.W.2d 151, 154-55 (Tex.App.–Fort Worth 1997, no writ.). The record evidence is insufficient to establish that Mosser Law PLLC signed any pleadings in this case, and is insufficient to establish that James C. Mosser signed two of the four pleadings filed in this case. All pleadings and the claims contained therein had some legal and factual basis for their filing, or were warranted by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, such that the court could not have concluded otherwise. Furthermore, on the basis of the record before it, the court could not have ever concluded that any of the parties to this suit were diverse, let alone the driving force behind the addition of Appellee to this lawsuit. These findings constitute abuses of discretion, for which the only adequate remedy is reversal and rendition of judgment against Appellee on his motion of sanctions by this court, and an award of

68

attorney's fees and costs on appeal to Mosser.


Respectfully Submitted, *MOSSERLAW PLLC*


/s/ James C. Mosser
James C. Mosser
Texas Bar No. 00789784
Nicholas D. Mosser
Texas Bar No. 24075405
Paul J. Downey
Texas Bar No. 24080659
2805 Dallas Parkway, Suite 220
Plano, Texas 75093
Tel. (972) 733-3223
Fax. (469) 626-1073
courtdocuments@mosserlaw.com

**CERTIFICATE OF COMPLIANCE**

I certify that there are 13520 words in this document, and that I relied on the word count function of WordPerfect X6, which was used to prepare this document

/s/ Paul J. Downey
Paul J. Downey

**CERTIFICATE OF SERVICE**

I certify that on November 23, 2015, this document was served on the following parties or counsels of record in accordance with the Texas Rules of Appellate Procedure 9.5

/s/ Paul J. Downey
Paul J. Downey

**Appellee**
Bob Mims, represented by
Hay, Wittenburg, Davis, Caldwell & Bale, LLP
Larry W. Bale
Texas Bar No. 01629830
P.O. Box 271
San Angelo, Texas 76092
Tel. (325) 658-2728
lwb@hwdcb.com

NO. 03-15-00365-CV

JAMES C. MOSSER and
MOSSER LAW PLLC,

Appellant,

v.

BOB MIMS,

Appellee.

## APPENDIX TO APPELLANT'S BRIEF

### LIST OF DOCUMENTS

Exhibit 1: Order Granting Bob Mims' First Amended Motion for
Sanctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App.1

Exhibit 2: Order Granting Bob Mims' First Motion for
Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App.8

Exhibit 3: Order Granting Bob Mims' Second Motion for Summary
Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App.10

Exhibit 4: TEX. CONST. ART. XVI § 50. . . . . . . . . . . . . . . . . . . . App.11

Exhibit 5: TEX. BUS. & COM. CODE § 27.01. . . . . . . . . . . . . . . . App.29

Exhibit 6: TEX. CIV. PRAC. & REM. CODE § 10.001. . . . . . . . . . . App.31

Exhibit 7: TEX. CIV. PRAC. & REM. CODE § 10.004. . . . . . . . . . . App.32

Exhibit 8: TEX. TAX CODE § 23.01. . . . . . . . . . . . . . . . . . . . . . . App.34

Exhibit 9: TEX. R. CIV. P. 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . App.36

Exhibit 10: Tom Green County Central Appraisal District Tax Assessments of 1969 Beaty Road, San Angelo, Texas 76904 for 2008, 2009, and 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   App.37

Exhibit 11: Act of May 28, 1983, 68th Leg. R.S., ch. 949, 1983 Gen. Laws. 5208. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   App. 41

CAUSE NO. C130102C

| | | |
|---|---|---|
| BEN MELTON | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| | § | |
| CU MEMBER'S MORTGAGE | § | 340TH JUDICIAL DISTRICT |
| A DIVISION OF COLONIAL SAVINGS, F.A | § | |
| FIRST WESTERN TITLE CO. AND | § | |
| BOB MIMS | § | TOM GREEN COUNTY, TEXAS |

## ORDER GRANTING BOB MIMS' FIRST AMENDED MOTION FOR SANCTIONS

On January 7, 2015, the Court heard and considered Bob Mims' First Amended Motion for Sanctions. Proper notice of the hearing was provided to Bob Mims, Ben Melton, Mosser Law PLLC, and James C. Mosser. Bob Mims appeared in person and by his attorney of record. James C. Mosser appeared telephonically through Court Call. Ben Melton appeared by his attorney of record, James C. Mosser. Mosser Law PLLC appeared by James C. Mosser.

After considering the evidence, the pleadings on file, and argument of counsel the Court finds that Bob Mims' First Amended Motion for Sanctions should be granted. In connection with this ruling, and in compliance with Rule 13 of the Texas Rules of Civil Procedure and Section 10.005 of the Texas Civil Practice and Remedies Code, the Court finds as follows:

1.  On January 17, 2009, Plaintiff Ben Melton signed a Uniform Residential Loan Application seeking a $225,000 home equity loan for his residential, homestead property at 1969 Beatty Road, San Angelo, Texas 76904 ("the Property").

2.  Ben Melton's loan application stated that the present market value of the Property was $350,000.

3.  On January 20, 2009, Defendant CU Members Mortgage, a division of Colonial Savings, F.A. ("CU Members Mortgage"), submitted an Appraisal

-1-

EXHIBIT 1                                                                      APP. 1

Order form for the Property to Defendant Bob Mims, a State of Texas certified residential real estate appraiser.

4.  Bob Mims inspected the Property on January 30, 2009, and prepared a handwritten diagram of the improvements on the Property.

5.  On February 3, 2009, Bob Mims submitted to CU Members Mortgage a Uniform Residential Appraisal Report ("Mims' Report"). Mims' Report stated his opinion that the market value of the Property was $300,000 as of January 30, 2009.

6.  The FIRREA/USPAP Addendum to Mims' Report states that the intended use of the report was to assist the lender in making a decision on a new loan origination for use in a mortgage refinancing transaction; the intended user of the report was CU Members Mortgage and/or its assigns; and no other use or users of the report were permitted.

7.  On March 13, 2009, Ben Melton obtained a $223,648 home equity loan extension of credit from CU Members Mortgage.

8.  On March 13, 2009, Ben Melton signed an "Acknowledgment Regarding Fair Market Value of Homestead Property" wherein Melton acknowledged that the fair market value of the Property was $300,000.

9.  On March 13, 2013, James C. Mosser of Mosser Law PLLC filed Plaintiff's Original Petition in this cause. The Original Petition alleged that Defendant Bob Mims provided a false and fraudulent real estate appraisal for the Property; and that Bob Mims aided the other Defendants in violating Article XVI, Section 50 of the Texas Constitution by providing a false and fraudulent real estate appraisal. The Original Petition alleged that the Defendants committed fraud in a real estate transaction and sought the forfeiture of all principal and interest under the $223,648 home equity loan as well as exemplary damages and attorney's fees.

10. On March 14, 2013, the Tom Green County District Clerk issued citation to be served upon Bob Mims. Bob Mims' original citation has not been filed in this cause.

11. A "Return of Service with Declaration" filed on June 5, 2013, states that Mark R. Jaco received citation on May 10, 2013, and forwarded same on May 17, 2013, to Defendant Bob Mims via certified mail, return receipt requested.

12. There is an unexplained delay of more than two months from the date of the preparation of Bob Mims' citation to the date of service of the citation.

-2-

EXHIBIT 1

APP. 2

29. There is no evidence in the record to indicate that Ben Melton has any experience, knowledge, training, or qualifications to express opinions that are expert in nature about Bob Mims' alleged violations of appraising standards or appraisal standards.

30. The claims and causes of action asserted by and on behalf of Ben Melton are similar to the claims and causes of action that Mosser Law PLLC and James C. Mosser asserted in *John Priester, Jr. and Bettie Priester v. Long Beach Mortgage Company and JP Morgan Chase & Co.* in Cause No. 380-04445-2010 in the 380th District Court of Collin County, Texas ("*Priester*"). In *Priester* Mosser Law PLLC and James C. Mosser alleged that the Defendants violated Article XVI, Section 50 of the Texas Constitution in the closing of a $180,000 home equity loan that the Priesters obtained almost five years before filing their original petition. The relief requested by and on behalf of the Priesters was the forfeiture of principal and interest for the home equity loan, exemplary damages, and attorneys fees.

31. *Priester* was removed from the 380th District Court to the United States District Court for the Eastern District of Texas, Sherman Division, where it was assigned Case No. 4:10-CV-641. The basis of the removal was complete diversity of citizenship of the parties.

32. After *Priester* was removed to federal court Mosser Law PLLC and James C. Mosser filed two amended complaints (Second Amended Complaint for Declaratory Relief and Third Amended Complaint for Declaratory Relief) without obtaining leave of Court. Both of the amended complaints sought to join as defendants two non-diverse Texas residents (Cristobal M. Galindo and Kristen L. Tinsley) and two non-diverse Texas corporations (Alamo Title Company and Cristobal M. Galindo, P.C.). The amended complaints alleged that Cristobal M. Galindo (an attorney), Kristen L. Tinsley (a notary public), and Alamo Title Company committed fraud, fraudulent concealment, and negligent misrepresentation in the closing of the Priesters' home equity loan.

33. On December 8, 2011, U.S. District Judge Michael H. Schneider signed a "Memorandum Adopting Report and Recommendation of the United States Magistrate Judge" in Case No. 4:10-CV-641. In relevant part, the Memorandum concluded that the proposed amended complaint was "primarily for the purpose of defeating federal jurisdiction;" found that leave should not be granted to add the non-diverse defendants; and dismissed the case for failing to state a claim upon which relief could be granted under Federal Rules of Civil Procedure 12(b)(6).

34. Mosser Law PLLC and James C. Mosser appealed the dismissal of Case No. 4:10-CV-641 to the United States Court of Appeals, Fifth Circuit. On

-5-

EXHIBIT 1                                                                              APP. 3

February 13, 2013, the Fifth Circuit Court of Appeals issued its opinion affirming the trial Court's decision.

35. Ben Melton's Original Petition was filed in this cause on March 13, 2013, less than 30 days after the Fifth Circuit Court of Appeals issued its opinion in *Priester*.

36. As in *Priester*, the primary recovery sought in this cause by and on behalf of Ben Melton is the forfeiture of the principal and interest for a home equity loan. This ground of recovery was available to Ben Melton whether or not Bob Mims was joined as a defendant in this cause.

37. This Court therefore concludes that the primary purpose for naming Bob Mims as a defendant in this cause was to defeat diversity jurisdiction and the removal of this cause to federal court.

38. All of the claims and causes of action asserted against Bob Mims in the petitions filed in this cause are barred by the applicable statute of limitations.

39. Ben Melton does not have a viable claim or cause of action against Bob Mims for fraud in a real estate transaction, because that remedy is not available in a home equity loan transaction; and, even if that remedy were available, it is barred by limitations. There is no basis in law or in fact to assert a claim or cause of action against Bob Mims for fraud in a real estate transaction.

40. Ben Melton does not have a viable claim or cause of action against Bob Mims for deceptive trade practices, because Ben Melton does not qualify as a consumer under the Deceptive Trade Practices Act; and, even if Ben Melton did qualify as a consumer, a Deceptive Trade Practices Act claim or cause of action is barred by limitations. There is no basis in law or in fact to assert a Deceptive Trade Practices Act claim or cause of action against Bob Mims.

41. Ben Melton does not have a viable claim or cause of action against Bob Mims for fraud, because Bob Mims did not make a false representation of a material fact; and, even if Bob Mims had made a false representation of a material fact, a fraud claim or cause of action is by limitations. There is no basis in law or in fact to assert a fraud claim or cause of action against Bob Mims.

42. Ben Melton does not have a viable claim or cause of action against Bob Mims for breach of contract, because Ben Melton was not a third party beneficiary to the contract in question; and, even if Ben Melton were a third party beneficiary to the contract in question, a breach of contract claim or

-6-

EXHIBIT 1                                                                APP. 4

cause of action is barred by limitations. There is no basis in law or in fact to assert a breach of contract claim or cause of action against Bob Mims.

43. Ben Melton does not have a viable claim or cause of action against Bob Mims for negligence, because Bob Mims did not owe a legal duty to Ben Melton; and, even if Bob Mims did owe a legal duty to Ben Melton, a negligence claim or cause of action is barred by limitations. There is no basis in law or in fact to assert a negligence claim or cause of action against Bob Mims.

44. The four petitions that have been filed in this cause have not alleged any claim or cause of action against Bob Mims that would or could have resulted in an award of monetary damages against Bob Mims. Without an award of monetary damages against Bob Mims, Ben Melton could not recover exemplary damages from Bob Mims.

45. The petitions, pleadings, and other documents filed in this cause that allege fault or misconduct on the part of Bob Mims are groundless and brought in bad faith or groundless and brought for the purpose of harassment.

46. There is no basis in law or in fact for filing the petitions against Bob Mims, nor is there any basis in law or in fact for the fault or misconduct alleged to have been committed by Bob Mims.

47. The attorney or attorneys who filed the petitions in this cause and asserted the claims and causes of action against Bob Mims failed to make a proper investigation or a reasonable inquiry of those claims and causes of action or the factual allegations of fault or misconduct by and against Bob Mims.

48. The petitions, pleadings, and other documents filed in this cause that have asserted claims and causes of action against Bob Mims or have alleged fault or misconduct by and against Bob Mims have been intended to harass or cause unnecessary delay or needless increase in the cost of litigation.

49. The claims, causes of action, and legal contentions asserted against Bob Mims in the pleadings and other documents filed in this cause are not warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

50. The allegations and factual contentions asserted against Bob Mims in the pleadings and other documents filed in this cause do not have evidentiary support, nor were they likely to have evidentiary support after a reasonable opportunity for investigation or discovery.

51. Appropriate sanctions should be entered against Ben Melton, Mosser Law PLLC, and James C. Mosser for violating Rule 13 of the Texas Rules of Civil Procedure and Chapter 10 of the Texas Civil Practice and Remedies Code.

-7-

EXHIBIT 1                                                                APP. 5

52. Appropriate sanctions include an award of Bob Mims' reasonable and necessary attorney's fees incurred in the trial court in the amount of $15,366.55 to be imposed jointly and severally against Ben Melton, Mosser Law PLLC, and James C. Mosser.

53. In the event Ben Melton, Mosser Law PLLC, or James C. Mosser appeal this order to the Third Court of Appeals, and that appeal is unsuccessful, then Bob Mims should be awarded an additional $25,000.00 for appellate attorney's fees, with such an award to be imposed jointly and severally against any or all of Ben Melton, Mosser Law PLLC, or James C. Mosser who appeal this order.

54. In the event Ben Melton, Mosser Law PLLC, or James C. Mosser file a petition for review to the Texas Supreme Court, and that petition for review is unsuccessful, then Bob Mims should be awarded an additional $15,000.00 for attorney's fees, with such an award to be imposed jointly and severally against any or all of Ben Melton, Mosser Law PLLC, or James C. Mosser who file such a petition for review.

It is, therefore, ORDERED that Bob Mims recover from Ben Melton, Mosser Law PLLC, and James C. Mosser, jointly and severally, the sum of $15,366.55 for violations of Rule 13 of the Texas Rules of Civil Procedure and Chapter 10 of the Texas Practice and Remedies Code.

It is further ORDERED that in the event this order is appealed to the Third Court of Appeals that Bob Mims shall recover the additional sum of $25,000.00, jointly and severally, from any or all of Ben Melton, Mosser Law PLLC, or James C. Mosser who file such an appeal but who do not obtain relief.

It is further ORDERED that in the event that a petition for review is filed in the Texas Supreme Court that Bob Mims shall recover the additional sum of $15,000.00, jointly and severally, from any or all of Ben Melton, Mosser Law PLLC, or James C. Mosser who participate in such appellate proceeding but who do not obtain relief.

-8-

EXHIBIT 1                                                                          APP. 6

It is further ORDERED that this Order Granting Bob Mims' First Amended Motion for Sanctions shall have all of the force and effect of a judgment of this Court; and that Bob Mims shall have all writs and processes necessary to enforce this Order.

Signed this _12th_ day of _March_ , 2015.

_____
DISTRICT JUDGE PRESIDING

EXHIBIT 1                                                                                           APP. 7

CAUSE NO. C130102C

| | | |
|---|---|---|
| BEN MELTON | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| CU MEMBER'S MORTGAGE | § | 340TH JUDICIAL DISTRICT |
| A DIVISION OF COLONIAL SAVINGS, F.A | § | |
| FIRST WESTERN TITLE CO. AND | § | |
| BOB MIMS | § | TOM GREEN COUNTY, TEXAS |

## ORDER GRANTING BOB MIMS' SECOND MOTION FOR SUMMARY JUDGMENT

On July 1, 2014, the Court considered by submission Bob Mims' Second Motion for Summary Judgment. After considering the pleadings on file and the summary judgment evidence timely filed and properly submitted for consideration, the Court finds that Bob Mims' Second Motion for Summary Judgment should be in all things granted.

Prior to signing this Order, the Court heard and considered Ben Melton's Motion to Correct Filing Date, or in the Alternative for Leave to File, and denied that motion by a separate order (said separate order being hereby incorporated and affirmed). The Court also considered, but did not rule on Bob Mims' Objections to Summary Judgment Evidence in Plaintiff's Response to Bob Mims' Second Motion for Summary Judgment, for the reason that those objections are moot as a result of the denial of Ben Melton's Motion to Correct Filing Date, or in the Alternative for Leave to File.

In connection with the entry of this Order, and to make this Order a final order that disposes of all pending claims and causes of action asserted by or against Bob Mims, the Court finds that prior to signing this Order Granting Bob Mims' Second Motion for Summary Judgment the Court has signed and entered the following orders in this cause (said prior orders being hereby incorporated and affirmed):

-1-

EXHIBIT 2

APP. 8

1.     Order Granting Bob Mims' Motion for Summary Judgment (Bob Mims' First Motion for Summary Judgment); and

2.     Order Granting Bob Mims' First Amended Motion for Sanctions.

The Court further finds that the granting of Bob Mims' Second Motion for Summary Judgment will dispose of all pending claims and causes of action asserted by or against Bob Mims.

It is, accordingly, ORDERED that Bob Mims' Second Motion for Summary Judgment is in all things GRANTED.

It is further ORDERED that all cost of court incurred by Bob Mims are taxed against Plaintiff, Ben Melton.

It is further ORDERED, ADJUDGED and DECREED that any and all relief requested by or against Bob Mims that has not been specifically granted is refused and denied.

Signed this _____/2ᵗʰ_____ day of March, 2015.

_____
DISTRICT JUDGE PRESIDING

-2-

EXHIBIT 2                                                                APP. 9

| | | |
|---|---|---|
| BEN MELTON | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| CU MEMBER'S MORTGAGE | § | 340TH JUDICIAL DISTRICT |
| A DIVISION OF COLONIAL SAVINGS, F.A | § | |
| FIRST WESTERN TITLE CO. AND | § | |
| BOB MIMS | § | TOM GREEN COUNTY, TEXAS |

## ORDER GRANTING BOB MIMS' MOTION FOR SUMMARY JUDGMENT

On January 10, 2014, the Court heard oral argument on Bob Mims' Motion for Summary Judgment. After considering the pleadings on file, the summary judgment evidence admitted for consideration, and the argument of counsel, the Court finds that Bob Mims' Motion for Summary Judgment should be in all things granted.

Prior to entering its ruling on Bob Mims' Motion for Summary Judgment, the Court heard and considered Bob Mims' Objections to Plaintiff's Summary Judgment Evidence, which was filed prior to the hearing on Bob Mims' Motion for Summary Judgment. The Court has determined that the three objections in Bob Mims' Objections to Plaintiff's Summary Judgment Evidence are sustained and that the objectionable summary judgment evidence in Plaintiff's Response to Bob Mims' Motion for Summary Judgment should be stricken from the record and not considered for any purpose.

It is, accordingly, ORDERED that the three objections in Bob Mims' Objections to Plaintiff's Summary Judgment Evidence are sustained and the objectionable summary judgment evidence in Plaintiff's Response to Bob Mims' Motion for Summary Judgment is stricken from the record and shall not be considered for any purpose.

It is further ORDERED that Bob Mims' Motion for Summary Judgment is in all things granted.

Signed this _21st_ day of May 2014.

_____
DISTRICT JUDGE PRESIDING

EXHIBIT 3          19          APP. 10

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
Constitution of the State of Texas 1876 (Refs & Annos)
Article XVI. General Provisions

Vernon's Ann.Texas Const. Art. 16, § 50

§ 50. Homestead; protection from forced sale; mortgages, trust deeds and liens

Effective: November 22, 2013
Currentness

(a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:

(1) the purchase money thereof, or a part of such purchase money;

(2) the taxes due thereon;

(3) an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding;

(4) the refinance of a lien against a homestead, including a federal tax lien resulting from the tax debt of both spouses, if the homestead is a family homestead, or from the tax debt of the owner;

(5) work and material used in constructing new improvements thereon, if contracted for in writing, or work and material used to repair or renovate existing improvements thereon if:

(A) the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead;

(B) the contract for the work and material is not executed by the owner or the owner's spouse before the fifth day after the owner makes written application for any extension of credit for the work and material, unless the work and material are necessary to complete immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing;

(C) the contract for the work and material expressly provides that the owner may rescind the contract without penalty or charge within three days after the execution of the contract by all parties, unless the work and material are necessary to complete

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing; and

(D) the contract for the work and material is executed by the owner and the owner's spouse only at the office of a third-party lender making an extension of credit for the work and material, an attorney at law, or a title company;

(6) an extension of credit that:

(A) is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse;

(B) is of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made;

(C) is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud;

(D) is secured by a lien that may be foreclosed upon only by a court order;

(E) does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit;

(F) is not a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit;

(G) is payable in advance without penalty or other charge;

(H) is not secured by any additional real or personal property other than the homestead;

(I) is not secured by homestead property that on the date of closing is designated for agricultural use as provided by statutes governing property tax, unless such homestead property is used primarily for the production of milk;

(J) may not be accelerated because of a decrease in the market value of the homestead or because of the owner's default under other indebtedness not secured by a prior valid encumbrance against the homestead;

(K) is the only debt secured by the homestead at the time the extension of credit is made unless the other debt was made for a purpose described by Subsections (a)(1)-(a)(5) or Subsection (a)(8) of this section;

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(L) is scheduled to be repaid:

(i) in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment; or

(ii) if the extension of credit is a home equity line of credit, in periodic payments described under Subsection (t)(8) of this section;

(M) is closed not before:

(i) the 12th day after the later of the date that the owner of the homestead submits a loan application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section;

(ii) one business day after the date that the owner of the homestead receives a copy of the loan application if not previously provided and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing. If a bona fide emergency or another good cause exists and the lender obtains the written consent of the owner, the lender may provide the documentation to the owner or the lender may modify previously provided documentation on the date of closing; and

(iii) the first anniversary of the closing date of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property, except a refinance described by Paragraph (Q)(x)(f) of this subdivision, unless the owner on oath requests an earlier closing due to a state of emergency that:

(a) has been declared by the president of the United States or the governor as provided by law; and

(b) applies to the area where the homestead is located;

(N) is closed only at the office of the lender, an attorney at law, or a title company;

(O) permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute;

(P) is made by one of the following that has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area:

(i) a bank, savings and loan association, savings bank, or credit union doing business under the laws of this state or the United States;

(ii) a federally chartered lending instrumentality or a person approved as a mortgagee by the United States government to make federally insured loans;

EXHIBIT 4

(iii) a person licensed to make regulated loans, as provided by statute of this state;

(iv) a person who sold the homestead property to the current owner and who provided all or part of the financing for the purchase;

(v) a person who is related to the homestead property owner within the second degree of affinity or consanguinity; or

(vi) a person regulated by this state as a mortgage broker; and

(Q) is made on the condition that:

(i) the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender;

(ii) the owner of the homestead not assign wages as security for the extension of credit;

(iii) the owner of the homestead not sign any instrument in which blanks relating to substantive terms of agreement are left to be filled in;

(iv) the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding;

(v) at the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit;

(vi) the security instruments securing the extension of credit contain a disclosure that the extension of credit is the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(vii) within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit;

(viii) the owner of the homestead and any spouse of the owner may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge;

(ix) the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead property on the date the extension of credit is made;

EXHIBIT 4 WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(x) except as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:

(a) paying to the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b) sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c) sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d) delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f) if the failure to comply cannot be cured under Subparagraphs (x)(a) -(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section; and

(xi) the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the extension of credit is made by a person other than a person described under Paragraph (P) of this subdivision or if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents;

(7) a reverse mortgage; or

(8) the conversion and refinance of a personal property lien secured by a manufactured home to a lien on real property, including the refinance of the purchase price of the manufactured home, the cost of installing the manufactured home on the real property, and the refinance of the purchase price of the real property.

(b) An owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law.

(c) No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section, whether such mortgage, trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married. All pretended sales of the homestead involving any condition of defeasance shall be void.

(d) A purchaser or lender for value without actual knowledge may conclusively rely on an affidavit that designates other property as the homestead of the affiant and that states that the property to be conveyed or encumbered is not the homestead of the affiant.

(e) A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1)-(a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless:

(1) the refinance of the debt is an extension of credit described by Subsection (a)(6) of this section; or

(2) the advance of all the additional funds is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

(f) A refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of this section, may not be secured by a valid lien against the homestead unless the refinance of the debt is an extension of credit described by Subsection (a)(6) or (a)(7) of this section.

(g) An extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument:

"NOTICE CONCERNING EXTENSIONS OF CREDIT DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION:

"SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION ALLOWS CERTAIN LOANS TO BE SECURED AGAINST THE EQUITY IN YOUR HOME. SUCH LOANS ARE COMMONLY KNOWN AS EQUITY LOANS. IF YOU DO NOT REPAY THE LOAN OR IF YOU FAIL TO MEET THE TERMS OF THE LOAN, THE LENDER MAY FORECLOSE AND SELL YOUR HOME. THE CONSTITUTION PROVIDES THAT:

"(A) THE LOAN MUST BE VOLUNTARILY CREATED WITH THE CONSENT OF EACH OWNER OF YOUR HOME AND EACH OWNER'S SPOUSE;

"(B) THE PRINCIPAL LOAN AMOUNT AT THE TIME THE LOAN IS MADE MUST NOT EXCEED AN AMOUNT THAT, WHEN ADDED TO THE PRINCIPAL BALANCES OF ALL OTHER LIENS AGAINST YOUR HOME, IS MORE THAN 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME;

"(C) THE LOAN MUST BE WITHOUT RECOURSE FOR PERSONAL LIABILITY AGAINST YOU AND YOUR SPOUSE UNLESS YOU OR YOUR SPOUSE OBTAINED THIS EXTENSION OF CREDIT BY ACTUAL FRAUD;

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

"(D) THE LIEN SECURING THE LOAN MAY BE FORECLOSED UPON ONLY WITH A COURT ORDER;

"(E) FEES AND CHARGES TO MAKE THE LOAN MAY NOT EXCEED 3 PERCENT OF THE LOAN AMOUNT;

"(F) THE LOAN MAY NOT BE AN OPEN-END ACCOUNT THAT MAY BE DEBITED FROM TIME TO TIME OR UNDER WHICH CREDIT MAY BE EXTENDED FROM TIME TO TIME UNLESS IT IS A HOME EQUITY LINE OF CREDIT;

"(G) YOU MAY PREPAY THE LOAN WITHOUT PENALTY OR CHARGE;

"(H) NO ADDITIONAL COLLATERAL MAY BE SECURITY FOR THE LOAN;

"(I) THE LOAN MAY NOT BE SECURED BY HOMESTEAD PROPERTY THAT IS DESIGNATED FOR AGRICULTURAL USE AS OF THE DATE OF CLOSING, UNLESS THE AGRICULTURAL HOMESTEAD PROPERTY IS USED PRIMARILY FOR THE PRODUCTION OF MILK;

"(J) YOU ARE NOT REQUIRED TO REPAY THE LOAN EARLIER THAN AGREED SOLELY BECAUSE THE FAIR MARKET VALUE OF YOUR HOME DECREASES OR BECAUSE YOU DEFAULT ON ANOTHER LOAN THAT IS NOT SECURED BY YOUR HOME;

"(K) ONLY ONE LOAN DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MAY BE SECURED WITH YOUR HOME AT ANY GIVEN TIME;

"(L) THE LOAN MUST BE SCHEDULED TO BE REPAID IN PAYMENTS THAT EQUAL OR EXCEED THE AMOUNT OF ACCRUED INTEREST FOR EACH PAYMENT PERIOD;

"(M) THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A LOAN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER; AND MAY NOT WITHOUT YOUR CONSENT CLOSE BEFORE ONE BUSINESS DAY AFTER THE DATE ON WHICH YOU RECEIVE A COPY OF YOUR LOAN APPLICATION IF NOT PREVIOUSLY PROVIDED AND A FINAL ITEMIZED DISCLOSURE OF THE ACTUAL FEES, POINTS, INTEREST, COSTS, AND CHARGES THAT WILL BE CHARGED AT CLOSING; AND IF YOUR HOME WAS SECURITY FOR THE SAME TYPE OF LOAN WITHIN THE PAST YEAR, A NEW LOAN SECURED BY THE SAME PROPERTY MAY NOT CLOSE BEFORE ONE YEAR HAS PASSED FROM THE CLOSING DATE OF THE OTHER LOAN, UNLESS ON OATH YOU REQUEST AN EARLIER CLOSING DUE TO A DECLARED STATE OF EMERGENCY;

"(N) THE LOAN MAY CLOSE ONLY AT THE OFFICE OF THE LENDER, TITLE COMPANY, OR AN ATTORNEY AT LAW;

"(O) THE LENDER MAY CHARGE ANY FIXED OR VARIABLE RATE OF INTEREST AUTHORIZED BY STATUTE;

"(P) ONLY A LAWFULLY AUTHORIZED LENDER MAY MAKE LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(Q) LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MUST:

"(1) NOT REQUIRE YOU TO APPLY THE PROCEEDS TO ANOTHER DEBT EXCEPT A DEBT THAT IS SECURED BY YOUR HOME OR OWED TO ANOTHER LENDER;

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

"(2) NOT REQUIRE THAT YOU ASSIGN WAGES AS SECURITY;

"(3) NOT REQUIRE THAT YOU EXECUTE INSTRUMENTS WHICH HAVE BLANKS FOR SUBSTANTIVE TERMS OF AGREEMENT LEFT TO BE FILLED IN;

"(4) NOT REQUIRE THAT YOU SIGN A CONFESSION OF JUDGMENT OR POWER OF ATTORNEY TO ANOTHER PERSON TO CONFESS JUDGMENT OR APPEAR IN A LEGAL PROCEEDING ON YOUR BEHALF;

"(5) PROVIDE THAT YOU RECEIVE A COPY OF YOUR FINAL LOAN APPLICATION AND ALL EXECUTED DOCUMENTS YOU SIGN AT CLOSING;

"(6) PROVIDE THAT THE SECURITY INSTRUMENTS CONTAIN A DISCLOSURE THAT THIS LOAN IS A LOAN DEFINED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(7) PROVIDE THAT WHEN THE LOAN IS PAID IN FULL, THE LENDER WILL SIGN AND GIVE YOU A RELEASE OF LIEN OR AN ASSIGNMENT OF THE LIEN, WHICHEVER IS APPROPRIATE;

"(8) PROVIDE THAT YOU MAY, WITHIN 3 DAYS AFTER CLOSING, RESCIND THE LOAN WITHOUT PENALTY OR CHARGE;

"(9) PROVIDE THAT YOU AND THE LENDER ACKNOWLEDGE THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LOAN CLOSES; AND

"(10) PROVIDE THAT THE LENDER WILL FORFEIT ALL PRINCIPAL AND INTEREST IF THE LENDER FAILS TO COMPLY WITH THE LENDER'S OBLIGATIONS UNLESS THE LENDER CURES THE FAILURE TO COMPLY AS PROVIDED BY SECTION 50(a)(6)(Q)(x), ARTICLE XVI, OF THE TEXAS CONSTITUTION; AND

"(R) IF THE LOAN IS A HOME EQUITY LINE OF CREDIT:

"(1) YOU MAY REQUEST ADVANCES, REPAY MONEY, AND REBORROW MONEY UNDER THE LINE OF CREDIT;

"(2) EACH ADVANCE UNDER THE LINE OF CREDIT MUST BE IN AN AMOUNT OF AT LEAST $4,000;

"(3) YOU MAY NOT USE A CREDIT CARD, DEBIT CARD, OR SIMILAR DEVICE, OR PREPRINTED CHECK THAT YOU DID NOT SOLICIT, TO OBTAIN ADVANCES UNDER THE LINE OF CREDIT;

"(4) ANY FEES THE LENDER CHARGES MAY BE CHARGED AND COLLECTED ONLY AT THE TIME THE LINE OF CREDIT IS ESTABLISHED AND THE LENDER MAY NOT CHARGE A FEE IN CONNECTION WITH ANY ADVANCE;

"(5) THE MAXIMUM PRINCIPAL AMOUNT THAT MAY BE EXTENDED, WHEN ADDED TO ALL OTHER DEBTS SECURED BY YOUR HOME, MAY NOT EXCEED 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LINE OF CREDIT IS ESTABLISHED;

"(6) IF THE PRINCIPAL BALANCE UNDER THE LINE OF CREDIT AT ANY TIME EXCEEDS 50 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME, AS DETERMINED ON THE DATE THE LINE OF CREDIT IS ESTABLISHED, YOU MAY NOT CONTINUE TO REQUEST ADVANCES UNDER THE LINE OF CREDIT UNTIL THE BALANCE IS LESS THAN 50 PERCENT OF THE FAIR MARKET VALUE; AND

EXHIBIT 4 WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

"(7) THE LENDER MAY NOT UNILATERALLY AMEND THE TERMS OF THE LINE OF CREDIT.

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE."

If the discussions with the borrower are conducted primarily in a language other than English, the lender shall, before closing, provide an additional copy of the notice translated into the written language in which the discussions were conducted.

(h) A lender or assignee for value may conclusively rely on the written acknowledgment as to the fair market value of the homestead property made in accordance with Subsection (a)(6)(Q)(ix) of this section if:

(1) the value acknowledged to is the value estimate in an appraisal or evaluation prepared in accordance with a state or federal requirement applicable to an extension of credit under Subsection (a)(6); and

(2) the lender or assignee does not have actual knowledge at the time of the payment of value or advance of funds by the lender or assignee that the fair market value stated in the written acknowledgment was incorrect.

(i) This subsection shall not affect or impair any right of the borrower to recover damages from the lender or assignee under applicable law for wrongful foreclosure. A purchaser for value without actual knowledge may conclusively presume that a lien securing an extension of credit described by Subsection (a)(6) of this section was a valid lien securing the extension of credit with homestead property if:

(1) the security instruments securing the extension of credit contain a disclosure that the extension of credit secured by the lien was the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(2) the purchaser acquires the title to the property pursuant to or after the foreclosure of the voluntary lien; and

(3) the purchaser is not the lender or assignee under the extension of credit.

(j) Subsection (a)(6) and Subsections (e)-(i) of this section are not severable, and none of those provisions would have been enacted without the others. If any of those provisions are held to be preempted by the laws of the United States, all of those provisions are invalid. This subsection shall not apply to any lien or extension of credit made after January 1, 1998, and before the date any provision under Subsection (a)(6) or Subsections (e)-(i) is held to be preempted.

(k) "Reverse mortgage" means an extension of credit:

(1) that is secured by a voluntary lien on homestead property created by a written agreement with the consent of each owner and each owner's spouse;

(2) that is made to a person who is or whose spouse is 62 years or older;

EXHIBIT 4 © 2015 Thomson Reuters. No claim to original U.S. Government Works. APP. 19 9

(3) that is made without recourse for personal liability against each owner and the spouse of each owner;

(4) under which advances are provided to a borrower:

(A) based on the equity in a borrower's homestead; or

(B) for the purchase of homestead property that the borrower will occupy as a principal residence;

(5) that does not permit the lender to reduce the amount or number of advances because of an adjustment in the interest rate if periodic advances are to be made;

(6) that requires no payment of principal or interest until:

(A) all borrowers have died;

(B) the homestead property securing the loan is sold or otherwise transferred;

(C) all borrowers cease occupying the homestead property for a period of longer than 12 consecutive months without prior written approval from the lender;

(C-1) if the extension of credit is used for the purchase of homestead property, the borrower fails to timely occupy the homestead property as the borrower's principal residence within a specified period after the date the extension of credit is made that is stipulated in the written agreement creating the lien on the property; or

(D) the borrower:

(i) defaults on an obligation specified in the loan documents to repair and maintain, pay taxes and assessments on, or insure the homestead property;

(ii) commits actual fraud in connection with the loan; or

(iii) fails to maintain the priority of the lender's lien on the homestead property, after the lender gives notice to the borrower, by promptly discharging any lien that has priority or may obtain priority over the lender's lien within 10 days after the date the borrower receives the notice, unless the borrower:

(a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to the lender;

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings so as to prevent the enforcement of the lien or forfeiture of any part of the homestead property; or

(c) secures from the holder of the lien an agreement satisfactory to the lender subordinating the lien to all amounts secured by the lender's lien on the homestead property;

(7) that provides that if the lender fails to make loan advances as required in the loan documents and if the lender fails to cure the default as required in the loan documents after notice from the borrower, the lender forfeits all principal and interest of the reverse mortgage, provided, however, that this subdivision does not apply when a governmental agency or instrumentality takes an assignment of the loan in order to cure the default;

(8) that is not made unless the prospective borrower and the spouse of the prospective borrower attest in writing that the prospective borrower and the prospective borrower's spouse received counseling regarding the advisability and availability of reverse mortgages and other financial alternatives that was completed not earlier than the 180th day nor later than the 5th day before the date the extension of credit is closed;

(9) that is not closed before the 12th day after the date the lender provides to the prospective borrower the following written notice on a separate instrument, which the lender or originator and the borrower must sign for the notice to take effect:

"IMPORTANT NOTICE TO BORROWERS RELATED TO YOUR REVERSE MORTGAGE

"UNDER THE TEXAS TAX CODE, CERTAIN ELDERLY PERSONS MAY DEFER THE COLLECTION OF PROPERTY TAXES ON THEIR RESIDENCE HOMESTEAD. BY RECEIVING THIS REVERSE MORTGAGE YOU MAY BE REQUIRED TO FORGO ANY PREVIOUSLY APPROVED DEFERRAL OF PROPERTY TAX COLLECTION AND YOU MAYBE REQUIRED TO PAY PROPERTY TAXES ON AN ANNUAL BASIS ON THIS PROPERTY.

"THE LENDER MAY FORECLOSE THE REVERSE MORTGAGE AND YOU MAY LOSE YOUR HOME IF:

"(A) YOU DO NOT PAY THE TAXES OR OTHER ASSESSMENTS ON THE HOME EVEN IF YOU ARE ELIGIBLE TO DEFER PAYMENT OF PROPERTY TAXES;

"(B) YOU DO NOT MAINTAIN AND PAY FOR PROPERTY INSURANCE ON THE HOME AS REQUIRED BY THE LOAN DOCUMENTS;

"(C) YOU FAIL TO MAINTAIN THE HOME IN A STATE OF GOOD CONDITION AND REPAIR;

"(D) YOU CEASE OCCUPYING THE HOME FOR A PERIOD LONGER THAN 12 CONSECUTIVE MONTHS WITHOUT THE PRIOR WRITTEN APPROVAL FROM THE LENDER OR, IF THE EXTENSION OF CREDIT IS USED FOR THE PURCHASE OF THE HOME, YOU FAIL TO TIMELY OCCUPY THE HOME AS YOUR PRINCIPAL RESIDENCE WITHIN A PERIOD OF TIME AFTER THE EXTENSION OF CREDIT IS MADE THAT IS STIPULATED IN THE WRITTEN AGREEMENT CREATING THE LIEN ON THE HOME;

"(E) YOU SELL THE HOME OR OTHERWISE TRANSFER THE HOME WITHOUT PAYING OFF THE LOAN;

"(F) ALL BORROWERS HAVE DIED AND THE LOAN IS NOT REPAID;

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

"(G) YOU COMMIT ACTUAL FRAUD IN CONNECTION WITH THE LOAN; OR

"(H) YOU FAIL TO MAINTAIN THE PRIORITY OF THE LENDER'S LIEN ON THE HOME, AFTER THE LENDER GIVES NOTICE TO YOU, BY PROMPTLY DISCHARGING ANY LIEN THAT HAS PRIORITY OR MAY OBTAIN PRIORITY OVER THE LENDER'S LIEN WITHIN 10 DAYS AFTER THE DATE YOU RECEIVE THE NOTICE, UNLESS YOU:

"(1) AGREE IN WRITING TO THE PAYMENT OF THE OBLIGATION SECURED BY THE LIEN IN A MANNER ACCEPTABLE TO THE LENDER;

"(2) CONTEST IN GOOD FAITH THE LIEN BY, OR DEFEND AGAINST ENFORCEMENT OF THE LIEN IN, LEGAL PROCEEDINGS SO AS TO PREVENT THE ENFORCEMENT OF THE LIEN OR FORFEITURE OF ANY PART OF THE HOME; OR

"(3) SECURE FROM THE HOLDER OF THE LIEN AN AGREEMENT SATISFACTORY TO THE LENDER SUBORDINATING THE LIEN TO ALL AMOUNTS SECURED BY THE LENDER'S LIEN ON THE HOME.

"IF A GROUND FOR FORECLOSURE EXISTS, THE LENDER MAY NOT COMMENCE FORECLOSURE UNTIL THE LENDER GIVES YOU WRITTEN NOTICE BY MAIL THAT A GROUND FOR FORECLOSURE EXISTS AND GIVES YOU AN OPPORTUNITY TO REMEDY THE CONDITION CREATING THE GROUND FOR FORECLOSURE OR TO PAY THE REVERSE MORTGAGE DEBT WITHIN THE TIME PERMITTED BY SECTION 50(k)(10), ARTICLE XVI, OF THE TEXAS CONSTITUTION.THE LENDER MUST OBTAIN A COURT ORDER FOR FORECLOSURE EXCEPT THAT A COURT ORDER IS NOT REQUIRED IF THE FORECLOSURE OCCURS BECAUSE:

"(1) ALL BORROWERS HAVE DIED; OR

"(2) THE HOMESTEAD PROPERTY SECURING THE LOAN IS SOLD OR OTHERWISE TRANSFERRED."

"YOU SHOULD CONSULT WITH YOUR HOME COUNSELOR OR AN ATTORNEY IF YOU HAVE ANY CONCERNS ABOUT THESE OBLIGATIONS BEFORE YOU CLOSE YOUR REVERSE MORTGAGE LOAN. TO LOCATE AN ATTORNEY IN YOUR AREA, YOU MAY WISH TO CONTACT THE STATE BAR OF TEXAS."

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED IN PART BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE.";

(10) that does not permit the lender to commence foreclosure until the lender gives notice to the borrower, in the manner provided for a notice by mail related to the foreclosure of liens under Subsection (a)(6) of this section, that a ground for foreclosure exists and gives the borrower at least 30 days, or at least 20 days in the event of a default under Subdivision (6)(D)(iii) of this subsection, to:

(A) remedy the condition creating the ground for foreclosure;

(B) pay the debt secured by the homestead property from proceeds of the sale of the homestead property by the borrower or from any other sources; or

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(C) convey the homestead property to the lender by a deed in lieu of foreclosure; and

(11) that is secured by a lien that may be foreclosed upon only by a court order, if the foreclosure is for a ground other than a ground stated by Subdivision (6)(A) or (B) of this subsection.

(l) Advances made under a reverse mortgage and interest on those advances have priority over a lien filed for record in the real property records in the county where the homestead property is located after the reverse mortgage is filed for record in the real property records of that county.

(m) A reverse mortgage may provide for an interest rate that is fixed or adjustable and may also provide for interest that is contingent on appreciation in the fair market value of the homestead property. Although payment of principal or interest shall not be required under a reverse mortgage until the entire loan becomes due and payable, interest may accrue and be compounded during the term of the loan as provided by the reverse mortgage loan agreement.

(n) A reverse mortgage that is secured by a valid lien against homestead property may be made or acquired without regard to the following provisions of any other law of this state:

(1) a limitation on the purpose and use of future advances or other mortgage proceeds;

(2) a limitation on future advances to a term of years or a limitation on the term of open-end account advances;

(3) a limitation on the term during which future advances take priority over intervening advances;

(4) a requirement that a maximum loan amount be stated in the reverse mortgage loan documents;

(5) a prohibition on balloon payments;

(6) a prohibition on compound interest and interest on interest;

(7) a prohibition on contracting for, charging, or receiving any rate of interest authorized by any law of this state authorizing a lender to contract for a rate of interest; and

(8) a requirement that a percentage of the reverse mortgage proceeds be advanced before the assignment of the reverse mortgage.

(o) For the purposes of determining eligibility under any statute relating to payments, allowances, benefits, or services provided on a means-tested basis by this state, including supplemental security income, low-income energy assistance, property tax relief, medical assistance, and general assistance:

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(1) reverse mortgage loan advances made to a borrower are considered proceeds from a loan and not income; and

(2) undisbursed funds under a reverse mortgage loan are considered equity in a borrower's home and not proceeds from a loan.

(p) The advances made on a reverse mortgage loan under which more than one advance is made must be made according to the terms established by the loan documents by one or more of the following methods:

(1) an initial advance at any time and future advances at regular intervals;

(2) an initial advance at any time and future advances at regular intervals in which the amounts advanced may be reduced, for one or more advances, at the request of the borrower;

(3) an initial advance at any time and future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached;

(4) an initial advance at any time, future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached, and subsequent advances at times and in amounts requested by the borrower according to the terms established by the loan documents to the extent that the outstanding balance is repaid; or

(5) at any time by the lender, on behalf of the borrower, if the borrower fails to timely pay any of the following that the borrower is obligated to pay under the loan documents to the extent necessary to protect the lender's interest in or the value of the homestead property:

(A) taxes;

(B) insurance;

(C) costs of repairs or maintenance performed by a person or company that is not an employee of the lender or a person or company that directly or indirectly controls, is controlled by, or is under common control with the lender;

(D) assessments levied against the homestead property; and

(E) any lien that has, or may obtain, priority over the lender's lien as it is established in the loan documents.

(q) To the extent that any statutes of this state, including without limitation, Section 41.001 of the Texas Property Code, purport to limit encumbrances that may properly be fixed on homestead property in a manner that does not permit encumbrances for extensions of credit described in Subsection (a)(6) or (a)(7) of this section, the same shall be superseded to the extent that such encumbrances shall be permitted to be fixed upon homestead property in the manner provided for by this amendment.

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(r) The supreme court shall promulgate rules of civil procedure for expedited foreclosure proceedings related to the foreclosure of liens under Subsection (a)(6) of this section and to foreclosure of a reverse mortgage lien that requires a court order.

(s) The Finance Commission of Texas shall appoint a director to conduct research on the availability, quality, and prices of financial services and research the practices of business entities in the state that provide financial services under this section. The director shall collect information and produce reports on lending activity of those making loans under this section. The director shall report his or her findings to the legislature not later than December 1 of each year.

(t) A home equity line of credit is a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which:

(1) the owner requests advances, repays money, and reborrows money;

(2) any single debit or advance is not less than $4,000;

(3) the owner does not use a credit card, debit card, or similar device, or preprinted check unsolicited by the borrower, to obtain an advance;

(4) any fees described by Subsection (a)(6)(E) of this section are charged and collected only at the time the extension of credit is established and no fee is charged or collected in connection with any debit or advance;

(5) the maximum principal amount that may be extended under the account, when added to the aggregate total of the outstanding principal balances of all indebtedness secured by the homestead on the date the extension of credit is established, does not exceed an amount described under Subsection (a)(6)(B) of this section;

(6) no additional debits or advances are made if the total principal amount outstanding exceeds an amount equal to 50 percent of the fair market value of the homestead as determined on the date the account is established;

(7) the lender or holder may not unilaterally amend the extension of credit; and

(8) repayment is to be made in regular periodic installments, not more often than every 14 days and not less often than monthly, beginning not later than two months from the date the extension of credit is established, and:

(A) during the period during which the owner may request advances, each installment equals or exceeds the amount of accrued interest; and

(B) after the period during which the owner may request advances, installments are substantially equal.

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

(u) The legislature may by statute delegate one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is:

(1) in effect at the time of the act or omission; and

(2) made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.

(v) A reverse mortgage must provide that:

(1) the owner does not use a credit card, debit card, preprinted solicitation check, or similar device to obtain an advance;

(2) after the time the extension of credit is established, no transaction fee is charged or collected solely in connection with any debit or advance; and

(3) the lender or holder may not unilaterally amend the extension of credit.

**Credits**
Amended Nov. 6, 1973; Nov. 7, 1995; Nov. 4, 1997, eff. Jan. 1, 1998; Nov. 2, 1999; Nov. 6, 2001, eff. Nov. 26, 2001; Sept. 13, 2003, eff. Sept. 29, 2003; Nov. 8, 2005, eff. Nov. 23, 2005; Nov. 6, 2007, eff. Dec. 4, 2007; Nov. 5, 2013, eff. Nov. 22, 2013.

**Editors' Notes**

### INTERPRETIVE COMMENTARY

#### 1993 Main Volume

The homestead exemption was a Texas creation. It was the logical development of the evolution of the changing social attitude toward debtors whereby first the person, then the personal property, and finally the real estate of the debtor were freed from the control of the creditor through the abolition of imprisonment for debt, the extension of chattel exemptions, and the adoption of the homestead exemption.

While Texas was governed by Spanish colonial law and, subsequent thereto, the law of Mexico, it became familiarized with chattel exemptions for such items as family clothing, the minimum of furniture for the family abode, and the implements of the breadwinner, none of which could be used for forced application to the payment of debts. In an agricultural community, it was no great step to extend the concept underlying these chattel exemptions to the family home and land.

The earliest homestead exemption law was the Statute of January 26, 1839 (Laws of the Republic of Texas, First Session of the Third Congress, 1839, pp. 125-126). Beyond statements to its intent and purpose, the idea of homestead exemption elicited slight notice, scarcely any comment, and no discernible opposition. Its passage was hurried through the legislature on the last day of its session with the legislators apparently unaware of the important precedent the law would establish or of the far-reaching effect it was to have.

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

The direct cause of the law was the United States Panic of 1837 and the ensuing depression during which numerous families lost homes and farms through foreclosures, and in the Republic of Texas business became stagnate, money scarce, and credit unobtainable. Most Texans were in debt, and the young nation was in economic peril. The homestead exemption was looked upon as a necessary measure to offset the economic danger to Texans and Texas. It had a three-fold purpose: (1) to preserve the integrity of the family as the basic element of social organization, and, incidentally, to encourage colonization for in a frontier society each pioneer family was of definite value to the community; (2) to provide the debtor with a home for his family and some means to support them and to recoup his economic losses so as to prevent the family from becoming a burdensome charge upon the public; (3) to retain in pioneers the feeling of freedom and sense of independence which was deemed necessary to the continued existence of democratic institutions.

Although the Constitution of the Republic contained no provisions with reference to homestead exemptions, Texans quickly learned that homestead exemptions could not be left to the mercy of the legislators. The Fourth Congress of the Republic, in an act concerning executions (Act of February 5, 1840, sections 4 and 24, Laws of Republic of Texas, Session of Fourth Congress, pp. 93-98), annulled the law of 1839, although no explanation for this action can be found in the journals of that congress. The next legislature, however, repealed the action of the Fourth Congress and re-enacted the original homestead exemption law. (Act of December 22, 1840, Laws of Republic of Texas, Session of Fifth Congress, pp. 61-62). Consequently, the convention which drew up the Constitution of 1845, designed to provide for the government of the State of Texas after annexation by the United States, determined to safeguard the homestead by putting it beyond the reach of legislators as well as creditors by incorporating an exemption provision in the constitution.

Article VII, Section 22, of the Constitution of 1845 declared:

> The Legislature shall have power to protect by law from forced sale, a certain portion of the property of all heads of families. The homestead of a family not to exceed two hundred acres of land, (not included in a town or city,) or any town or city lot or lots, in value not to exceed two thousand dollars, shall not be subject to forced sale, for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by consent of the wife, in such manner as the Legislature may hereafter point out.

There was little opposition in the convention to the homestead exemption as such, although it was adopted by a vote of only 42 to 14. The opposition specifically went on record as approving of the principle but objected to the wording of the measure on various grounds--the limitation on the size of the homestead was felt to be too small or too large; or objection was voiced to the provision preventing the husband from alienating the homestead without the wife's consent.

The Constitutions of 1861 and 1866 carried forward those homestead provisions. The Constitution of 1869 provided for the exemption of a rural homestead not exceeding 200 acres or an urban homestead not in excess of $5,000 evaluation without reference to improvements. The present constitution included the 1869 provisions with the added provision that a place of business might be included in an urban homestead and that certain property of an unmarried adult might be exempt as a homestead.

At the convention of 1875 opposition again arose to the provision preventing the husband from alienating the homestead without the wife's consent. But eloquent pleas were made picturing the sad effect of drunken and worthless husbands bringing their wives to want and poverty, and the provision was retained.

Notes of Decisions (1676)

EXHIBIT 4
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Ann. Texas Const. Art. 16, § 50, TX CONST Art. 16, § 50
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.      EXHIBIT 4                                                      APP. 28   18

Vernon's Texas Statutes and Codes Annotated
   Business and Commerce Code (Refs & Annos)
     Title 3. Insolvency, Fraudulent Transfers, and Fraud
       Chapter 27. Fraud

V.T.C.A., Bus. & C. § 27.01

§ 27.01. Fraud in Real Estate and Stock Transactions

Currentness

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

  (1) false representation of a past or existing material fact, when the false representation is

    (A) made to a person for the purpose of inducing that person to enter into a contract; and

    (B) relied on by that person in entering into that contract; or

  (2) false promise to do an act, when the false promise is

    (A) material;

    (B) made with the intention of not fulfilling it;

    (C) made to a person for the purpose of inducing that person to enter into a contract; and

    (D) relied on by that person in entering into that contract.

(b) A person who makes a false representation or false promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for actual damages.

(c) A person who makes a false representation or false promise with actual awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(d) A person who (1) has actual awareness of the falsity of a representation or promise made by another person and (2) fails to disclose the falsity of the representation or promise to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

EXHIBIT 5

(e) Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

**Credits**

Acts 1967, 60th Leg., vol. 2, p. 2343, ch. 785, § 1. Amended by Acts 1983, 68th Leg., p. 5208, ch. 949, §§ 1, 2, eff. Sept. 1, 1983.

Notes of Decisions (614)

V. T. C. A., Bus. & C. § 27.01, TX BUS & COM § 27.01
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 5

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle A. General Provisions
        Chapter 10. Sanctions for Frivolous Pleadings and Motions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 10.001

§ 10.001. Signing of Pleadings and Motions

Currentness

The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:

(1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

**Credits**
Added by Acts 1995, 74th Leg., ch. 137, § 1, eff. Sept. 1, 1995.

Notes of Decisions (110)

V. T. C. A., Civil Practice & Remedies Code § 10.001, TX CIV PRAC & REM § 10.001
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 6 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 2. Trial, Judgment, and Appeal
            Subtitle A. General Provisions
                Chapter 10. Sanctions for Frivolous Pleadings and Motions (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 10.004

§ 10.004. Violation; Sanction

Currentness

(a) A court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both.

(b) The sanction must be limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated.

(c) A sanction may include any of the following:

(1) a directive to the violator to perform, or refrain from performing, an act;

(2) an order to pay a penalty into court; and

(3) an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees.

(d) The court may not award monetary sanctions against a represented party for a violation of Section 10.001(2).

(e) The court may not award monetary sanctions on its own initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party or the party's attorney who is to be sanctioned.

(f) The filing of a general denial under Rule 92, Texas Rules of Civil Procedure, shall not be deemed a violation of this chapter.

**Credits**
Added by Acts 1995, 74th Leg., ch. 137, § 1, eff. Sept. 1, 1995.

Notes of Decisions (80)

V. T. C. A., Civil Practice & Remedies Code § 10.004, TX CIV PRAC & REM § 10.004

EXHIBIT 7
WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 7**

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 1. Property Tax Code
      Subtitle D. Appraisal and Assessment (Refs & Annos)
        Chapter 23. Appraisal Methods and Procedures (Refs & Annos)
          Subchapter A. Appraisals Generally

V.T.C.A., Tax Code § 23.01

§ 23.01. Appraisals Generally

Effective: September 1, 2011
Currentness

(a) Except as otherwise provided by this chapter, all taxable property is appraised at its market value as of January 1.

(b) The market value of property shall be determined by the application of generally accepted appraisal methods and techniques. If the appraisal district determines the appraised value of a property using mass appraisal standards, the mass appraisal standards must comply with the Uniform Standards of Professional Appraisal Practice. The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property. However, each property shall be appraised based upon the individual characteristics that affect the property's market value, and all available evidence that is specific to the value of the property shall be taken into account in determining the property's market value.

(c) Notwithstanding Section 1.04(7)(C), in determining the market value of a residence homestead, the chief appraiser may not exclude from consideration the value of other residential property that is in the same neighborhood as the residence homestead being appraised and would otherwise be considered in appraising the residence homestead because the other residential property:

  (1) was sold at a foreclosure sale conducted in any of the three years preceding the tax year in which the residence homestead is being appraised and was comparable at the time of sale based on relevant characteristics with other residence homesteads in the same neighborhood; or

  (2) has a market value that has declined because of a declining economy.

(d) The market value of a residence homestead shall be determined solely on the basis of the property's value as a residence homestead, regardless of whether the residential use of the property by the owner is considered to be the highest and best use of the property.

(e) Notwithstanding any provision of this subchapter to the contrary, if the appraised value of property in a tax year is lowered under Subtitle F, the appraised value of the property as finally determined under that subtitle is considered to be the appraised value of the property for that tax year. In the following tax year, the chief appraiser may not increase the appraised value of the property unless the increase by the chief appraiser is reasonably supported by substantial evidence when all of the reliable

EXHIBIT 8

and probative evidence in the record is considered as a whole. If the appraised value is finally determined in a protest under Section 41.41(a)(2) or an appeal under Section 42.26, the chief appraiser may satisfy the requirement to reasonably support by substantial evidence an increase in the appraised value of the property in the following tax year by presenting evidence showing that the inequality in the appraisal of property has been corrected with regard to the properties that were considered in determining the value of the subject property. The burden of proof is on the chief appraiser to support an increase in the appraised value of property under the circumstances described by this subsection.

<Text of (f) effective January 1, 2016>

(f) The selection of comparable properties and the application of appropriate adjustments for the determination of an appraised value of property by any person under Section 41.43(b)(3) or 42.26(a)(3) must be based on the application of generally accepted appraisal methods and techniques. Adjustments must be based on recognized methods and techniques that are necessary to produce a credible opinion.

<Text of (g) effective January 1, 2016>

(g) Notwithstanding any other provision of this section, property owners representing themselves are entitled to offer an opinion of and present argument and evidence related to the market and appraised value or the inequality of appraisal of the owner's property.

**Credits**
Acts 1979, 66th Leg., p. 2252, ch. 841, § 1, eff. Jan. 1, 1982. Amended by Acts 1985, 69th Leg., ch. 823, § 5, eff. Jan. 1, 1986; Acts 1997, 75th Leg., ch. 1039, § 21, eff. Jan. 1, 1998; Acts 2009, 81st Leg., ch. 619, § 1, eff. Jan. 1, 2010; Acts 2009, 81st Leg., ch. 1211, § 1, eff. Jan. 1, 2010; Acts 2009, 81st Leg., ch. 1405, § 2, eff. Jan. 1, 2010; Acts 2011, 82nd Leg., ch. 91 (S.B. 1303), § 27.001(56), (57), eff. Sept. 1, 2011; Acts 2015, 84th Leg., ch. 101 (H.B. 2083), § 1, eff. Jan. 1, 2016.

Notes of Decisions (127)

V. T. C. A., Tax Code § 23.01, TX TAX § 23.01
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 8                                                                                                    APP. 35   2
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

> Vernon's Texas Rules Annotated
> Texas Rules of Civil Procedure
> Part I. General Rules (Refs & Annos)

TX Rules of Civil Procedure, Rule 13

Rule 13. Effect of Signing of Pleadings, Motions and Other Papers; Sanctions

Currentness

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215, [1] upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of July 15, 1987, eff. Jan. 1, 1988; April 24, 1990, eff. Sept. 1, 1990.

**Editors' Notes**

**COMMENT--1990**

To require notice and hearing before a court determines to impose sanctions, to specify that any sanction imposed be appropriate, and to eliminate the 90-day "grace" period provided in the former version of the rule.

Notes of Decisions (591)

Footnotes

1        Probably Vernon's Ann.Rules Civ.Proc., rule 215.2(b).

Vernon's Ann. Texas Rules Civ. Proc., Rule 13, TX R RCP Rule 13

Current with amendments received through 6/1/2015

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 9 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TOM GREEN APPRAISAL DISTRICT (2008)

Property ID : R000099602    Geo ID : 28-03500-0000-014-01    1/1

## Ownership

MELTON BEN
1969 BEATY RD
SAN ANGELO, TX 76904-7747
OWNER INTEREST 1.0

LEGAL:
SITUS:

**Exemptions/Deed:** HOMESTEAD

**Property ID :** R000099602    METES AND BOUNDS

### Legal Information

| Appr By | Appraisal Coding |
|---|---|
| Appr Dt 01/01/00 | Check By |
| | Check Dt 1/1/1900 |

### Agent

| Sale Dt | Type | Vol | Page | Inst | Deed Dt | Price | Value@Sale | Grantee | Grantor |
|---|---|---|---|---|---|---|---|---|---|
| 5/12/00 | | 591 | 473 | 490541 | 5/12/00 | +++++ | 189,700 | MELTON BEN | MELTON BEN |
| 7/14/97 | | 591 | 473 | 438830 | 7/14/97 | +++++ | 189,700 | MELTON BEN | ALLEN GEORGE W & DEBBIE |
| 3/25/97 | | 574 | 704 | 733594 | 3/25/97 | +++++ | 189,700 | ALLEN GEORGE W & DEBBIE | SEVART JOE A |

### Mortgage
MTG: 290 COLONIAL SAVINDS, PA

| Land Code | Units / Alt Units | | | | Cpu | Cpu Cd | Mkt Cpu | Adjustment Codes | Adj% | Adj Amt | Hs | Mkt Value | Ptd Prd | Prod Code | Prod Use Yr Grant | Units | Cpu Spec Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | ========= | | | 0 | | | | | ======= |
| | | | | | | | | | 0 | | | | | | | | 0 |

| Building Code | Hs Year/Eff Yr | Class | Sqft | Cpsf | Buildings | Features | Depreciation % | Condition | % | Fn% | Ec% | Cpl% | Loc% | Net Adj% | Value | Feature Code | Cpsf / Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Geo Quad    Aerial    Map Id    Use

### Comments

| | 2008 Ptd | Change +/- | Prior 2007 Ptd | Entity / Description | Exemption | Txbl Value | Tax Rate | Frz Yr | Ext. Tax Levy | Nbh Coding | Misc Coding |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Impr Homesite + | 136,500 | 0 | 136,500 | CR TOM GREEN COUNTY | 22,720 | 90,880 | .0052582 | | 477.87 | | |
| Land Homesite + | 35,000 A1 | 0 | 35,000 A1 | CT CITY OF SAN ANGELO | 22,720 | 90,880 | .0082750 | | 752.03 | | |
| Total Market = | 171,500 | 0 | 171,500 | SA SAN ANGELO ISD | 37,720 | 75,880 | .0111000 | | 842.27 | | |
| Hs Cap Loss - | 57,900 | -10,300 | 68,200 | ** ESTIMATED TOTAL | | | | | ======= | | |
| Assessed = | 171,500 | 0 | 171,500 | | | | | | 2,072.17 | | |

User  JAN    Print Date  10/23/2015 4:43:43 PM    Property ID : R000099602    Geo ID : 28-03500-0000-014-01    Quick Link :

EXHIBIT 10

# TOM GREEN APPRAISAL DISTRICT (2009)

Property ID : R000099602  Geo ID : 28-03500-0000-014-01  1/1

| Ownership | Exemptions/Deed | Property ID : R000099602 Geo ID : 28-03500-0000-014-01 |
|---|---|---|
| **MELTON BEN**<br>1969 BEATY RD<br>SAN ANGELO, TX 76904-7747<br>OWNER INTEREST 1.0 | HOMESTEAD | METES AND BOUNDS |

LEGAL:
SITUS:

Legal Information

**Appraisal Coding**

| Appr By | Check By |
|---|---|
| Appr Dt 01/01/00 | Check Dt 1/1/1900 |

**Agent**

Mortgage
MTG: 290 COLONIAL SAVINDS, PA

| Sale Dt | Vol | Page | Inst | Deed Dt | Price | Value@Sale | Grantee | Grantor |
|---|---|---|---|---|---|---|---|---|
| 5/12/00 | 591 | 473 | 490541 | 5/12/00 | +++++ | 189,700 | MELTON BEN | MELTON BEN |
| 7/14/97 | 574 | 704 | 438830 | 7/14/97 | +++++ | 189,700 | MELTON BEN | ALLEN GEORGE W & DEBBIE |
| 3/25/97 | | | 733594 | 3/25/97 | +++++ | 189,700 | ALLEN GEORGE W & DEBBIE | SEVART JOE A |

**Building Code**  Hs Year/Eff Yr  Class  Sqft  Cpsf  Buildings  Features  Depreciation %  Condition  %  Fn%  Ec%  Cpl%  Loc%  Net Adj%  Value  Feature Code  Cpsf / Value

**Land Code**  Units / Alt Units  Cpu  Cpu Cd  Mkt Cpu  Adjustment Codes  Adj%  Adj Amt  Hs  Mkt Value  Ptd Prd  Prod Code  Prod Use  Yr Grant  Units  Cpu  Spec Value

Geo Quad  Aerial  Map Id  Use

0

| Entity / Description | Exemption | Txbl Value | Tax Rate | Frz Yr | Ext. Tax Levy | Nbh Coding | Misc Coding |
|---|---|---|---|---|---|---|---|
| CR TOM GREEN COUNTY | 25,000 | 100,000 | .0052500 | | 525.00 | | |
| CT CITY OF SAN ANGELO | 25,000 | 100,000 | .0081750 | | 817.50 | | |
| SA SAN ANGELO ISD | 40,000 | 85,000 | .0135250 | | 1,149.62 | | |
| ** ESTIMATED TOTAL | | | | | 2,492.12 | | |

| | 2009 Ptd | Change +/- | Prior 2008 Ptd |
|---|---|---|---|
| Impr Homesite + | 137,700 | 1,200 | 136,500 |
| Land Homesite + | 52,000  A1 | 17,000 | 35,000  A1 |
| Total Market = | 189,700 | 18,200 | 171,500 |
| Hs Cap Loss - | 64,700 | 6,800 | 57,900 |
| Assessed = | 189,700 | 18,200 | 171,500 |

Comments

User  JAN
Print Date  10/23/2015 4:43:19 PM  Property ID : R000099602  Geo ID : 28-03500-0000-014-01

EXHIBIT 10

APP. 38

# TOM GREEN APPRAISAL DISTRICT (2015)

Property ID : R000099602  Geo ID : 28-03500-0000-014-01  1/1

## Ownership

MELTON BEN
1969 BEATY RD
SAN ANGELO, TX 76904-7747
OWNER INTEREST 1.0

LEGAL: SUBD: LAKE NASWORTHY,GROUP 1, BLK: 1, LOT: 14-A SECTION 2
STUS: 1969 BEATY ROAD

### Exemptions/Deed

HOMESTEAD / OVER 65
INST: 490541
DATE: 5/12/2000

METES AND BOUNDS

0400 ()
DETGAR3 ()
COVPOR3 ()
0690 ()
0750 ()
0940 ()
1140 ()

### Appraisal Coding

| Appr By BW | Check By BW |
| --- | --- |
| Appr Dt 06/02/14 | Check Dt 6/2/2014 |

CERTIFIED

### Legal Information

Mortgage
MTG: 290 COLONIAL SAVINDS, PA

| Sale Dt | Type | Vol | Page | Inst | Deed Dt | Price | Value@Sale | Grantee | Grantor |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 5/12/00 | | 591 | 473 | 490541 | 5/12/00 | +++++ | 189,700 | MELTON BEN | MELTON BEN |
| 7/14/97 | | 591 | 473 | 438830 | 7/14/97 | +++++ | 189,700 | MELTON BEN | ALLEN GEORGE W & DEBBIE |
| 3/25/97 | | 574 | 704 | 733594 | 3/25/97 | +++++ | 189,700 | ALLEN GEORGE W & DEBBIE SEVART JOE A |

Agent

| Geo Quad | Aerial | Map Id | Use |
| --- | --- | --- | --- |
| 3 | | | |

### Building Code

SQFT MA: 1540   MKT CSF MA: 135.974   CSF IMPR : 102.209

| Building Code | Hs Year/Eff Yr | Class | Sqft | Cpsf | Buildings | Features | Depreciation % | Condition | % | Fn% | Ec% | Cpl% | Loc% | Net Adj% | Value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 0400-HOUSE | 1977/NA | QRG | 1,540 | 83.00 | 127,820 | 0 QR | -5% | 0% | 0% | 100% | 0% | 0% | -5.0% | 121,429 |
| DETGAR3-DETCHD/GAR | 1977/NA | QRG | 572 | 14.94 | 8,546 | 0 QR | -5% | 0% | 0% | 100% | 0% | 0% | -5.0% | 8,119 |
| COVPOR3-O/C PORCH | 2004/NA | QRG | 440 | 16.60 | 7,304 | 0 QR | -5% | 0% | 0% | 100% | 0% | 0% | -5.0% | 6,939 |
| 0690-DECK | 2004/NA | *FLV | 1 | 7,500.00 | 7,500.00 | 0 | 0% | 0% | 0% | 100% | 0% | 0.0% | 0.0% | 7,500 |
| 0750-SWIM POOL | 2004/NA | *FLV | 1 | 8,000.00 | 8,000.00 | 0 | 0% | 0% | 0% | 100% | 0% | 0.0% | 0.0% | 8,000 |
| 0940-BOAT DOCK | 2004/NA | *FLV | 456 | 12.50 | 5,700 | 0 | -5% | 0% | 0% | 100% | 0% | -5.0% | -5.0% | 5,415 |
| 1140-SEA WALL | 1977/NA | *FLV | 0 | 0.00 | 0 | 0 | 0% | 0% | 0% | 100% | 0% | 0.0% | * | 0 |
| | | | ===== | | ========= | === | | | | | | | | ======= |
| | | | 3,010 | | 164,870 | 0 | | | | | | | | 157,402 |

### Land Code

| Land Code | Units / Alt Units | Cpu | Cpu Cd | Mkt Cpu | Adjustment Codes | Adj% | Adj Amt Hs | Mkt Value | Ptd Prd | Prod Code | Prod Use Yr Grant | Units | Cpu Spec Value |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 0220 | 130,000.0 | | 52,000.00 | | | 0% | * | 52,000 | 0 | | | | |
| LAKE LEASE | | | | | | | | | | | | | |
| | | | | | | | ====== | | | | | ====== |
| | | | | | | | 52,000 | | | | | 0 |

### Comments

| | 2015 | | | | Prior | 2014 | Ptd |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Ptd | Change +/- | | | | | |
| Impr Homesite + | 157,400 | A1 | 19,670 | 137,730 | A1 | | |
| Land Homesite + | 52,000 | A1 | 0 | 52,000 | A1 | | |
| Total Market + | 209,400 | | 19,670 | 189,730 | | | |
| Hs Cap Loss - | 700 | | N/A | | | | |
| Assessed = | 208,700 | | 18,970 | 189,730 | | | |

| Entity / Description | Exemption | Txbl Value | Tax Rate | Frz Yr | Ext. Tax Levy |
| --- | --- | --- | --- | --- | --- |
| CR TOM GREEN COUNTY | 66,740 | 141,960 | .0051250 | 2015 | 727.54 |
| CT CITY OF SAN ANGELO | 41,740 | 166,960 | .0077600 | 2015 | 1,295.61 |
| SA SAN ANGELO ISD | 35,000 | 173,700 | .0123500 | 2015 | 2,145.20 |
| ** ESTIMATED TOTAL | | | | | ====== |
| | | | | | 4,168.35 |

User JAN   Print Date 10/23/2015 4:57:02 PM   Property ID : R000099602   Geo ID : 28-03500-0000-014-01   Quick Link :

### Feature Code

| Feature Code | Units | Cpu | Spec Value | Cpsf / Value |
| --- | --- | --- | --- | --- |
| | | | | ====== |
| | | | | 0 |

Nbh Coding: COUPONREDO   Misc Coding

Scale 0'

EXHIBIT 10

APP. 39

| | | XMS | LAND | BLDG | AGUSE | TOTAL | DUE | PAID |
|---|---|---|---|---|---|---|---|---|
| 1986 SEVART JOE A | | Y---- | 3000 | 43700 | | 46700 | 548.27 | 548.27 12/30/86 |
| 1987 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 545.52 | 545.52 12/31/87 |
| 1988 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 557.59 | 557.59 12/30/88 |
| 1989 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 650.88 | 650.88 11/14/89 |
| 1990 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 732.52 | 732.52 11/07/90 |
| 1991 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 757.48 | 757.48 12/30/91 |
| 1992 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 795.91 | 795.91 12/28/92 |
| 1993 SEVART JOE A<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 826.72 | 826.72 12/23/93 |
| 1994 SEVART JOE A<br>LOT 14-A | | YY--- | 3000 | 43700 | | 46700 | 542.98 | 542.98 12/22/94 |
| 1995 SEVART JOE A<br>LOT 14-A | | YY--Y | 3000 | 43700 | | 46700 | 546.49 | 546.49 12/28/95 |
| 1996 SEVART JOE A<br>LOT 14-A | | YY--Y | 3000 | 43700 | | 46700 | 551.62 | 551.62 12/12/96 |
| 1997 MELTON BEN<br>LOT 14-A | | YY--Y | 3000 | 43700 | | 46700 | 411.47 | 411.47 12/31/97 |
| 1998 MELTON BEN<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 822.82 | 822.82 12/09/98 |
| 1999 MELTON BEN<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 837.77 | 837.77 12/20/99 |
| 2000 MELTON BEN<br>LOT 14-A | | Y---- | 3000 | 43700 | | 46700 | 839.13 | 839.13 12/22/00 |
| 2001 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 3000 | 43700 | | 46700 | 853.14 | 853.14 12/31/01 |
| 2002 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 3000 | 43700 | | 46700 | 870.88 | 870.88 12/04/02 |
| 2003 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 3000 | 43700 | | 46700 | 870.23 | 870.23 12/18/03 |
| 2004 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 3000 | 43700 | | 46700 | 871.97 | 871.97 12/23/04 |
| 2005 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 35000 | 136500 | | 171500 | 1779.54 | 1779.54 12/15/05 |
| 2006 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 35000 | 136500 | | 171500 | 1897.01 | 1897.01 12/18/06 |
| 2007 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 35000 | 136500 | | 171500 | 1879.52 | 1879.52 12/20/07 |
| 2008 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 35000 | 136500 | | 171500 | 2072.17 | 2072.17 12/31/08 |
| 2009 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 52000 | 137700 | | 189700 | 2492.13 | 2492.13 12/29/09 |
| 2010 MELTON BEN<br>LOT 14-A SECTION 2 | | Y---- | 52000 | 137700 | | 189700 | 2723.63 | 2723.63 1/06/11 |

EXHIBIT 10                                                    APP. 40

## FRAUD—REAL ESTATE OR STOCK TRANSACTIONS

### CHAPTER 949

H. B. No. 1849

AN ACT

relating to fraud in a transaction involving real estate or stock in a corporation or joint stock company.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. Subsections (b) and (c), Section 27.01, Business & Commerce Code, are amended[8] to read as follows:

(b) A person who makes a false representation or false promise commits[,--and--a--person--who--benefits--from--that-false representation-or-false-premise,-commit] the fraud described in Subsection (a) of this section and is [are-jointly-and-severally] liable to the person defrauded for actual damages. [The-measure-of actual-damages-is-the-difference-between--the--value--of--the--real estate-or-stock-as-represented-or-premised,-and-its-actual-value-in the--condition--in--which--it--is--delivered--at--the--time--of-the contract.]

(c) A person who [wilfully] makes a false representation or false promise with actual awareness of the falsity thereof commits[,--and--a--person--who--knowingly--benefits--from--a--false representation--or--false--premise,--commit] the fraud described in Subsection (a) of this section and is [are] liable to the person defrauded for exemplary damages [not-to-exceed-twice-the-amount-of the-actual--damages]. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

SECTION 2. Section 27.01, Business & Commerce Code, is amended by adding[9] Subsections (d) and (e) to read as follows:

(d) A person who (1) has actual awareness of the falsity of a representation or promise made by another person and (2) fails to

8. V.T.C.A. Bus. & C. § 27.01, subsecs. (b), (c).
9. V.T.C.A. Bus. & C. § 27.01, subsecs. (d), (e).

Additions in text indicated by underline; deletions by [strikeouts]

EXHIBIT 11                                                    APP. 41

disclose the falsity of the representation or promise to the person defrauded, and (3) benefits from the false representation or promise commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

(e) Any person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

SECTION 3.[10] This Act applies to fraud if every element of the fraud occurred on or after the effective date of this Act. If an element of fraud occurred before the effective date of this Act, the fraud is governed by Section 27.01, Business & Commerce Code, as it existed before being amended by this Act, and that law is continued in effect for that purpose.

SECTION 4.[10]    The    provisions    of    Section    27.01, Business & Commerce Code, as amended, and this Act do not abrogate or repeal any other laws relating to the rights, duties, obligations, or liabilities of principals and agents to one another or to third parties.

SECTION 5. This Act takes effect September 1, 1983.

SECTION 6. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended.

Passed by the House on April 20, 1983, by a non-record vote; House concurred in Senate amendments to H.B. No. 1849 on May 19, 1983, by a non-record vote; passed by the Senate, with amendments, on May 18, 1983, by a viva-voce vote.

Approved June 19, 1983.

Effective Sept. 1, 1983.

10. V.T.C.A. Bus. & C. § 27.01 note.

Additions in text indicated by underline; deletions by [strikeouts]

EXHIBIT 11                                                                APP. 42